# IN THE SUPREME COURT OF IOWA

No. 10–1230

Filed December 17, 2010

**IN THE INTEREST OF D.W.,**
    Minor Child,

**A.M.W.,** Mother,
    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, John G. Mullen, Judge.

State seeks further review of court of appeals' decision reversing juvenile court order terminating mother's parental rights. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Stephen W. Newport of Newport & Newport, P.L.C., Davenport, for appellant.

Thomas J. Miller, Attorney General, and Janet L. Hoffman and Bruce L. Kempkes, Assistant Attorneys General, for appellee.

**CADY, Justice.**

In this case, the State requests further review of the court of appeals' decision reversing an order by the juvenile court terminating a mother's parental rights. On our de novo review, we find the district court properly terminated the mother's parental rights. As a result, we vacate the decision of the court of appeals and affirm the decision of the juvenile court.

## I. Background Facts and Proceedings.

A.W. is the mother of D.W., who was born on June 26, 2009. A.W. was twenty-two years old at the time of D.W.'s birth. The Iowa Department of Human Services (DHS) determined D.W. was at risk for neglect and abuse due to A.W.'s history with DHS in two previous child-in-need-of-assistance (CINA) cases that resulted in the termination of her parental rights with respect to her two other children. Accordingly, DHS provided services and assistance to A.W. after D.W.'s birth and continued to monitor D.W.'s safety.

In August of 2009, DHS requested an emergency removal order when A.W. left D.W. in the care of D.W.'s intoxicated father, D.T., following a domestic dispute between the couple. D.T. had a history of substance abuse and domestic violence that formed the basis for the prior termination of parental rights involving the two older children. The juvenile court ordered the removal of D.W. from the home, and he has been in foster care since that time.[1]

Following the emergency removal, D.W. was adjudicated in need of assistance due to his parents' failure to provide appropriate care and

---

[1]D.T. did not make any effort throughout the reunification period to retain the right to care for D.W., and he does not appeal the juvenile court's order terminating his rights.

supervision. After the CINA adjudication, he was placed with the same foster home into which his two siblings had been adopted. A.W. was granted supervised visitation with D.W. three times per week. Throughout the period of attempted reunification, A.W. worked with DHS to develop the necessary skills to care for D.W. Although A.W. cooperated fully with the services DHS offered her, the case progress reports reflected continuous concern that A.W. was not retaining and applying the information given to her to improve her parenting skills. The case reports cited A.W.'s low IQ as the basis of her substandard and inconsistent parenting of D.W.

Ultimately, DHS concluded the goal of permanently reuniting D.W. with A.W. could not be met. On March 29, 2010, the juvenile court entered an order approving DHS's modified permanency plan for adoption. A termination petition was filed in April of 2010, nearly eight months after D.W.'s removal. The grounds for termination alleged A.W.'s failure to provide a safe home for D.W. due to her inability to retain information about proper care for D.W.'s evolving needs, along with her past history of neglect, substance abuse, and unhealthy relationships.

At trial, the evidence indicated that, although a nurturing and loving parent during visits, A.W. consistently struggled with long-term planning and safety evaluations for D.W. DHS service providers' testimony and case progress reports showed that A.W. failed to meet D.W.'s evolving developmental needs, such as spoon-feeding and providing D.W. with developmental exercise, age-appropriate toys, and teething relief. At the end of several visits shortly after removal, A.W. had difficulty remembering instruction she had been given on how to lock the car seat properly.

The evidence at trial also reflected that A.W. struggled with age-appropriate expectations for D.W., became frustrated easily, and lacked sufficiently stable housing. On one occasion, A.W. tried to teach D.W. to descend a steep stairway facing forward. On another occasion, A.W. placed D.W. in a sitting position on a couch unsupported and became frustrated when D.W. fell over. A.W. had difficulty remembering to feed D.W. with a spoon rather than a bottle after being reminded on numerous occasions. A.W. lived with her mother and her mother's fiancé and tended to blame her mother when visitation problems occurred. A.W. also tended to rely heavily on the service providers and her mother to watch D.W. while she was attending to other tasks, and she asked others to make decisions on long-term planning issues. A.W. often left home to stay with a cousin after becoming "bored at home," and this arrangement caused A.W. to be late for visits on several occasions. Throughout the reunification efforts, A.W. expressed a desire to move out of her mother's home, but was unable to show a financial ability to do so while providing stability for D.W. DHS service providers testified that, although A.W. listened to the advice she was given, she failed to apply it consistently without being reminded by a DHS worker.

After the contested hearing on July 6, 2010, the juvenile court ordered termination of A.W.'s parental rights. The court found termination appropriate pursuant to Iowa Code section 232.116(1)(*d*), (*e*), (*g*), (*h*), (*i*), and (*l*) (2009). A.W. appealed, arguing that the juvenile court had inappropriately based its order solely on A.W.'s mental disability rather than her ability to keep D.W. safe. She also claimed that termination is not in D.W.'s overall best interests because of a strong bond between them. The court of appeals reversed the juvenile court's order for termination. It found inadequate evidence in the record of an

inability to appropriately parent D.W. The majority of the court of appeals found the statutory requirements for termination had not been met and that the evidence of A.W.'s ability to consistently meet D.W.'s general basic needs, along with A.W.'s affectionate and nurturing behavior towards D.W., outweighed the "minor and intermittent safety issues" that arose throughout the case.

The State sought, and we granted, further review.

## II. Standard of Review.

Our review of termination of parental rights proceedings is de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116. *Id.* Evidence is "clear and convincing" when there are no "serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.*

## III. Analysis.

Termination of parental rights under chapter 232 follows a three-step analysis. *In re P.L.*, 778 N.W.2d at 39. First, the court must determine if a ground for termination under section 232.116(1) has been established. *Id.* If a ground for termination is established, the court must, secondly, apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in a termination of parental rights. *Id.* Third, if the statutory best-interest framework supports termination of parental rights, the court must consider if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights. *Id.*

**A. Grounds for Termination.** The juvenile court cited six independent grounds for termination under Iowa Code section 232.116(1). On appeal, we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence. After reviewing the record in this case de novo, we conclude grounds for termination exist under sections 232.116(1)(*d*) and 232.116(1)(*h*).

Under section 232.116(1)(*d*), termination may be ordered if the child was previously adjudicated a CINA and if, after services have been offered to the parents, the circumstances that led to the adjudication continue to exist. Iowa Code § 232.116(1)(*d*). In this case, it is undisputed that D.W. was adjudicated a CINA due to the risk of neglect based on A.W.'s lack of supervision. Moreover, the evidence established this risk continued to exist at the time of the termination hearing. Service providers working with A.W. found she was not responding to services to overcome those circumstances that led to the CINA adjudication. Not only did she fail to display an ability to properly care for D.W., she did not have a support system in place to help her improve. Instead of offering consistent and trustworthy support, her mother, brothers, and cousin exhibited questionable behavior during the removal and visitation period. Moreover, A.W. displayed a pattern of behavior that revealed a lack of a basic understanding of D.W.'s need for reliable adult care. For example, on more than one occasion, A.W. was not present at her mother's home to meet D.W. when he arrived for a scheduled visitation because she had become bored and left the home.

Section 232.116(1)(*h*) provides that termination may be ordered when there is clear and convincing evidence that a child under the age of three who has been adjudicated a CINA and removed from the parents'

care for at least the last six consecutive months cannot be returned to the parents' custody at the time of the termination hearing. Iowa Code § 232.116(1)(*h*). D.W. was less than a year old when he was removed and placed in foster care for over six months while service providers worked with A.W. The record does not provide any evidence that D.W. could safely be returned home with A.W. at the time of the termination hearing. The service providers and the guardian ad litem were unable to recommend reunification, despite A.W.'s marginal improvements after services were received. A.W. did display some improvement in some areas and was currently committed to sobriety. While this evidence provides some hope A.W. might eventually be able to parent D.W. safely and consistently in her home, our legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests. *In re C.B.*, 611 N.W.2d at 494. We do not " 'gamble with the children's future' " by asking them to continuously wait for a stable biological parent, particularly at such tender ages. *In re D.W.*, 385 N.W.2d 570, 578 (Iowa 1986) (quoting *In re Kester*, 228 N.W.2d 107, 110 (Iowa 1975)); *see also In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Children simply cannot wait for responsible parenting. Parenting . . . must be constant, responsible, and reliable."). A.W. has struggled to overcome her parenting deficiencies for over three years and has been unable to do so. We find clear and convincing evidence that grounds for termination exist under Iowa Code section 232.116(1)(*h*).

**B. Factors in Termination.** Having found statutory grounds for termination exist, we turn to further consider the circumstances described in section 232.116(2) that drive the actual decision-making process. In deciding whether to terminate parental rights based on a particular ground, we must give primary consideration to "the child's

safety, . . . the best placement for furthering the long-term nurturing and growth of the child, and . . . the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). This assessment may include whether "the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition."[2] *Id.* § 232.116(2)(*a*). Additionally, we may consider whether the child has been placed into a foster family, the extent to which the child has been integrated into the family, and whether the foster family is able and willing to adopt the child. *Id.* § 232.116(2)(*b*). Additional factors are identified under the statute to further assess the integration of the child into the foster family. *Id.*

The mental capacity of a parent and the existence of a preadoptive foster family in the life of a child, which are included in the statutory best-interest analysis, are relevant considerations in evaluating the safety of the child, the best placement for optimal growth of the child, and the physical, mental, and emotional condition and needs of the child. Thus, the termination analysis considers the ability of the parent to properly care for the child and the presence of another family to provide the care.

Upon our de novo review, we find the considerations guiding the decision support termination. The case progress reports and DHS service providers' testimony indicate A.W. has difficulty overcoming her intellectual impairment to adequately provide a safe and reliable home for D.W. Furthermore, A.W. was unable to care for D.W. without relying heavily on service providers and her mother. She frequently became angry while attempting to provide for D.W.'s needs and developing

---

[2]Section 232.116(2)(*a*) also includes a parent's imprisonment for a felony as an additional factor to consider.

mobility. A.W. demonstrated a sustained inability to understand D.W.'s developmental stages with age-appropriate expectations. She reported to DHS staff that "babies need to learn how to be considerate of the needs of the mother" and that one-year-old children should be able to comprehend and evaluate safety concerns. Despite DHS efforts, A.W. was also unable to understand D.W.'s developing nutritional needs. She frequently forgot items she was told D.W. needed during his next visit.

While we recognize that lower mental functioning alone is not sufficient grounds for termination, in this case it is a contributing factor to A.W.'s inability to provide a safe and stable home for D.W. *State ex rel. Leas*, 303 N.W.2d 414, 422 (Iowa 1981); *see also In re Wardle*, 207 N.W.2d 554, 563 (Iowa 1973) ("Ordinarily, mental disability in a parent does not operate in a vacuum so far as the best interest and welfare of his child is concerned but is usually a contributing factor in a person's inability to perform the duties of parenthood according to the needs of his child."). As D.W. continues to grow and develop, his need for physical, mental, and emotional guidance will only become more challenging. In assessing whether A.W. will be able to manage these new challenges independently, "[w]e gain insight into the child's prospects by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities." *In re M.S.*, 519 N.W.2d 398, 400 (Iowa 1994). A.W. has been involved with DHS over the last four years, including the targeted involvement in D.W.'s case over the last eighteen months. The services provided to A.W. have not improved her ability to provide for D.W.'s welfare to a point sufficient to have semi-supervised or unsupervised visits with D.W. We find A.W.'s current inability to anticipate and provide for her son's long-term welfare is a rocky foundation in which a child cannot find permanency.

Additionally, we note D.W. was placed in a preadoptive foster home where he has regularly resided since he was two months old with his two siblings. D.W. has successfully developed in this home, and all evidence suggests that he will continue to do so. We are convinced that A.W. has not developed the skills necessary to cope with D.W.'s critical needs in the statutory time frame allotted to her and accordingly find the factors of section 232.116(2) support termination.

**C. Exceptions to Termination.** Finally, we give consideration to whether any exception in section 232.116(3) applies to make termination unnecessary. In this case, the most relevant exception is whether "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(*c*). We do not find such evidence exists here. Although it is clear that A.W. loves her son, our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes A.W.'s inability to provide for D.W.'s developing needs. Over the course of D.W.'s young life, A.W. has only had closely supervised visits with him. Otherwise, D.W. has been in the consistent care of his foster family and daycare providers. We do not find that termination would be detrimental to D.W. based solely on the parent-child relationship.

**IV. Conclusion.**

We vacate the decision of the court of appeals and affirm the juvenile court order terminating the parental rights of A.W.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**