# IN THE SUPREME COURT OF IOWA

No. 13–1336

Filed February 21, 2014

**IN THE INTEREST OF A.M.,** Minor Child,

**A.M.,** Father,

      Appellant,

**J.O.,** Mother,

      Appellant,

**STATE OF IOWA,**

      Appellee.

___

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Susan F. Flaherty, District Associate Judge.

The State seeks further review of a court of appeals decision reversing a juvenile court order terminating parental rights. **COURT OF APPEALS DECISION VACATED; JUVENILE COURT ORDER AFFIRMED.**

Mark D. Fisher of Nidey Erdahl Tindal & Fisher, PLC, Cedar Rapids, for appellant father.

Wayne Eric Nelson, Assistant Public Defender, Cedar Rapids, for appellant mother.

Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant Attorney General, and Lance J. Heeren, Assistant County Attorney, for appellee State.

Jessica L. Wiebrand, Cedar Rapids, for intervenors maternal grandparents.

Cory J. Goldensoph, Cedar Rapids, for minor child.

**MANSFIELD, Justice**.

We are called upon to review the outcome of a termination of parental rights proceeding. Acting on the State's petition, the juvenile court terminated parental rights to a one-year-old child under Iowa Code section 232.116(1)(*h*) (2011). Both parents appealed. They argued the State had failed to prove the grounds for termination by clear and convincing evidence and termination was not in the child's best interests. *See id.* §§ 232.116(1)(*h*)(4), .116(2). The court of appeals reversed the juvenile court.

Upon further review, we now vacate the decision of the court of appeals and reinstate the order of the juvenile court. We find clear and convincing evidence that the child could not safely be returned to her parents' custody and also conclude that termination was in the child's best interests.

## I. Facts and Procedural History.

Jessica and Allen are the parents of A.M., a one-year-old girl born in February 2012. While Jessica and A.M. were still in the hospital following A.M.'s birth, the hospital staff expressed concerns about the couple's ability to care for A.M. Specifically, the staff worried about Jessica's lack of interest in feeding the baby. They noted a number of incidents where Jessica either did not feed the baby when urged to by staff or went extended periods of time without feeding the baby. Hospital staff indicated Jessica needed "regular reminders to feed the baby" and noted Jessica repeatedly requested the nursing staff feed the baby for her so that she could eat, sleep, or take a shower.

Jessica's behavior also raised concerns about her mental stability. Staff indicated they found her crying in her room, and she was observed to be "very anxious and rocking in her chair and bouncing her legs"

when talking with the staff about her past relationships, history of depression, and past suicidal thoughts. Her social worker later reported that Jessica was not taking her medications at the time.

Additionally, the hospital staff had concerns about Allen. Although he had been prescribed medication for his Tourette's syndrome, he was not taking it. The nurses expressed concerns about Allen's "ability to safe[l]y hold and care for the baby."

At the time of A.M.'s birth, the department of human services (DHS) was already involved with Jessica's two older children, S.O. (born 2005) and A.L. (born 2009).[1] Both children had been adjudicated children in need of assistance (CINA) in 2009 and removed from Jessica's care in 2011. S.O. had been placed in foster care, and A.L. had been placed with his father full-time.

Just two days after A.M.'s birth, the juvenile court granted the State's request for the temporary removal of A.M. from Jessica and Allen's custody. The State filed a CINA petition the same day. The petition alleged A.M. was a CINA under Iowa Code sections 232.2(6)(*c*)(2) (where the child "has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child") and 232.2(6)(*n*) (where the "parent's or guardian's mental capacity or condition . . . results in the child not receiving adequate care"). *See* Iowa Code § 232.2(6)(*c*)(2), .2(6)(*n*).

A removal hearing was held a few days later. At that time, Jessica stipulated to the continued separation of A.M. from her care. Allen did not appear. The court ordered DHS's custody of A.M. to continue and

---

[1]Allen is not the father of A.L. or S.O.

indicated A.M. would remain in foster family care because her parents had "not demonstrated consistent ability to care for an infant during hospitalization." The court added, "The parents' mental health and cognitive status is likely a barrier to them safely caring for the child and further evaluation needs to occur." Jessica and Allen were ordered to complete psychological and psychiatric evaluations and were granted visitation with A.M.

Thereafter, Jessica's parents, i.e., A.M.'s maternal grandparents, filed a petition to intervene. They asked to be considered as a placement option for A.M. Their request for intervention was granted.

A final pretrial conference on the CINA petition took place in early April 2012. Jessica and the guardian ad litem (GAL) stipulated to A.M.'s being adjudicated a CINA and to her placement in foster care. Allen, however, resisted the petition. The juvenile court adjudicated A.M. as a CINA vis-à-vis mother and child. The court found it was not in A.M.'s best interests to remain with Jessica because "the hospital reported issues with the parents' ability to provide basic care to an infant," Jessica's mental health was not stable, and there was "no further in-home or community based service which would alleviate the need for out-of-home placement." The court found foster family care was the "least restrictive placement in the child's best interests."

The CINA hearing with regard to Allen occurred on April 24. The court noted that, although a paternity test had been ordered on April 14, Allen had "not yet established paternity" of A.M.[2] The court further commented:

---

[2]Allen later submitted a DNA sample for a court-ordered paternity test. His paternity was established on May 24, 2012.

Jessica has agreed that foster family care is necessary at this time for [A.M.]. [Allen] does not agree and believes that [Jessica] knows how to care for a child but that her maturity and behavior are really the issue. [Allen] acknowledges that he is an inexperienced parent, but he is willing to learn. Observations of the professionals involved are that [Allen] is cooperative but not always attentive to the child during his visits and that it is likely to take significant repetition and reinforcement for [Allen] to develop the skills necessary to care for an infant. [Allen] acknowledges that he has some issue with anger management and that he is not currently taking medication for Tourette's Syndrome that has been prescribed. He is willing to do so but has not yet scheduled the appointment necessary for him to obtain the medication. [Allen] and [Jessica] are currently residing with friends and plan to move into an apartment in approximately two weeks. Their income is not stable and there is concern as to whether they will be able to financially maintain independent housing. For most of the past year they have resided with different family members.

The juvenile court thus found the State had met its burden of establishing A.M. was a CINA under Iowa Code sections 232.2(6)(*c*)(2) and 232.2(6)(*n*). Custody of A.M. was continued with DHS for foster family care placement. Jessica and Allen were allowed supervised visitation with A.M. three times per week, and DHS was given discretion to increase visitation to semisupervised "if deemed appropriate."

A case permanency plan was developed by DHS and submitted to the juvenile court on May 23. The stated goal for A.M. was to "return child to mother's home." The plan indicated there was a good prognosis for returning A.M. to her home, and she was expected to be returned within six months.

An in-court review was scheduled for July 20. DHS presented a progress report to the court and recommended A.M. continue in foster family care. Jessica and Allen had secured an apartment but continued to struggle financially as Allen had lost his job and Jessica was not making enough money to meet their needs. The couple were relying on general assistance to pay their rent. In addition, Jessica and Allen were

"not providing for [A.M.]'s tangible needs during visits and ha[d] to rely on supplies from the foster parents." The couple had missed a scheduled visit with all three children when they spent a day at the beach with their friends. They did not call or notify the provider's or A.M.'s foster parents that they would not be home for the visit. Jessica and Allen's visits with all three children remained fully supervised "due to concerns from providers that they are not able to supervise all three children and meet their needs appropriately." However, DHS requested the couple begin semisupervised visitation for A.M.'s solo visits and the court agreed to the request.

Another progress report was presented to the court before the September 28 review. It indicated Jessica and Allen's financial troubles continued even though Allen had secured part-time employment. Their rent for July and August had been paid by general assistance. Despite this, the couple had not managed to save money for September's rent and were behind on that payment. While Jessica and Allen continued to maintain a safe and clean apartment, their financial problems raised concerns about how long the couple could stay there. Allen could not afford his medication. Jessica and Allen continued to rely on the foster parents to provide basic supplies for A.M.'s visits.[3] On one occasion, Jessica and Allen had feuded. This led Allen to ride his bicycle on the interstate highway in the direction of his parents' home, until he was stopped by police.

---

[3]As became apparent at the termination of parental rights hearing, the issue was not simply one of limited resources. Given Jessica and Allen's actual income and actual out-of-pocket expenses (i.e., excluding items they didn't have to pay for), DHS believed the couple should have been able to keep up with their rent and buy basic items for A.M.'s visits such as a crib and formula.

Additionally, Allen had been sleeping during the semisupervised visits with A.M. because of his overnight work schedule at his new job. Allen originally denied this to the service provider who confronted him on the issue, but later admitted he had been asleep. DHS stressed that Allen "needs to be awake and alert during visits with [A.M.] in order to improve his parenting and assure A.M.'s safety."

Based on testing completed by Jessica and Allen, DHS concluded "both parents are capable of meeting the basic needs of the children but may need assistance with more complex needs such as discipline and decision making." Jessica's psychological testing revealed that she had borderline adult intellectual functioning. Allen's testing indicated he was in the lower side of the normal range of adult functioning. The evaluator noted Allen was "capable of learning things, but he probably will do best with a hands-on approach and dealing with things in a very concrete sort of way." DHS concluded that Jessica and Allen had made progress, but recommended that A.M. continue to reside with her foster family.

Over the next few months, additional issues arose with Jessica's and Allen's parenting. Visits with all three children had progressed to semisupervised during the month of November, and in that same month, A.M. was placed in relative care with her maternal grandparents (S.O. had already been placed in their care). However, service providers noted Jessica was "struggling to accept feedback from providers," and she was "getting frustrated and shutting down." She had "not been as receptive to accept alternate parenting advice when it appear[ed] that things that worked with [her older children were] not working with [A.M.]."

At the same time, the parents had problems feeding A.M. They told the service providers she would not eat during some visits. When the service providers were present, or A.M. was in the care of her foster

family, no feeding problems were observed. The parents were advised to write out a feeding schedule for A.M., but Allen and Jessica did not follow the suggestion.

Other ongoing problems had not been resolved. The couple continued to have difficulty learning parenting skills. Service providers indicated both parents would at times say they understood instructions and then later claim they did not understand those instructions. Financial troubles also continued to plague the couple as Jessica was receiving fewer hours at her fast food job because the boss believed she worked too slowly.[4] Allen's use of his medication for Tourette's syndrome remained inconsistent. During a family meeting, it was noted that even when Allen was able to afford his medication, he had taken less than half of his prescribed doses. The DHS worker pointed out that Allen's inability to properly self-medicate foretold he might not be able to properly administer medication to the children if necessary.

The report presented to the juvenile court for the November review concluded, "The children (A.M. and S.O.) are in need of permanency and it is unclear if granting more time to the parents will result in enough progress to place the children back with them."

On December 28, the State filed a petition for the termination of Jessica's and Allen's parental rights to A.M. and Jessica's parental rights to S.O. According to the supporting affidavit from the DHS caseworker, the GAL supported termination of parental rights. The affidavit further indicated that A.M.'s maternal grandparents were working to obtain a foster care and adoptive license so they might seek the permanent

---

[4]It also appeared that Allen and Jessica would occasionally take time off work even when they did not have enough money to pay their bills.

placement of A.M. and S.O. with them. The affidavit also outlined the case plan expectations for Jessica and Allen and indicated that both had failed to meet most of the expectations set out for them. The affidavit concluded, "While Jessica and Allen appear to be making progress, the children are in desperate need of permanency. Therefore, it is the recommendation of the Department of Human Services that parental rights be terminated . . . ." Without objection from any party, the maternal grandparents were permitted to intervene in the termination proceeding.

Another progress report was presented to the court in January 2013, and no change in visitation was recommended. Allen had reportedly shown signs of physical aggression towards objects. He got angry and broke his phone and "did other destructive things to items in the home." Allen also admitted he had driven Jessica's car even though he did not have a driver's license, and there was no insurance coverage for the vehicle. During December there had also been continued issues with A.M.'s feeding. On one occasion, the parents fed A.M. bananas even though they had been instructed not to because she was constipated; another time, the parents overfed her; another time they fed her less than the amount she was supposed to receive; and on another occasion, the parents forgot to give A.M. her morning bottle.

Additionally, when the maternal grandmother offered extra visits with A.M. and S.O. during the holidays, Jessica and Allen refused the opportunity because Allen's mother was not allowed to attend. DHS concluded such decisions made it "apparent that the parents allow other desires to come before the expectations they need to meet in order to have the children returned home."

The final progress report prior to the termination hearing was prepared in late February and presented to the court in early March. The DHS caseworker noted that during one of the three-child visits, Jessica and Allen had tried to feed the older children an entire meal consisting of an iceberg lettuce salad, which they had refused. The worker informed Jessica and Allen that this was "comparable to feeding the children a bottle of water for dinner as iceberg lettuce has no nutritional value and they were not adding any additional elements to the salad." Shortly thereafter, the parents gave the older children too much to eat as each of them received two full-size hot dogs, six chicken nuggets, and french fries. Additionally, Jessica and Allen suddenly notified DHS that the landlord of their one-bedroom apartment would only let them have one child with them, who had to be under the age of five. The couple had just signed a six-month lease they were unwilling to break. Despite the longtime reunification efforts for S.O., this meant S.O. could not reside with Jessica and Allen, regardless of the outcome of the termination hearing. DHS stated the couple "continue to have difficulty with meeting case plan expectations and understanding the severity of their choices with regard to their parental rights." In summary, DHS said that Jessica and Allen

> seem to have hit a plateau where their capabilities as parents may not allow them to make further progress. The children have been out of the home for a significant period of time and are in need of permanency. It is obvious that Jessica and Allen love and care for the children but it is also becoming very clear that it is not in the long-term best interest of [S.O.] and [A.M.] to be returned to their care. Allen and Jessica do not appear to have the functional skills at this time to take on the fulltime care of two or even just one child.

The report concluded with DHS's recommendation that the parental rights be terminated to allow the children to be adopted.[5]

At the in-court review on March 5, the court received the report of the GAL, which it made part of the record. In his report, the GAL stated, "Jessica and Allen continue to struggle in this case with achieving the skills needed to be able to provide basic care for their children." He did not think the parents were prepared to have A.M. back in their home. In the GAL's view, despite years of services, Jessica had not "come far enough to be able to properly care for [A.M.]." Regarding Allen, the GAL opined that he was trying and that "if he was given perhaps six months to a year more, he would be at a point which he could properly care for [A.M.], but I just don't think he is quite there yet."

On March 6, the termination of parental rights trial was held. Jessica consented to the termination of her rights to S.O., but both Allen and Jessica opposed the termination of their parental rights to A.M. Three service providers and the DHS caseworker testified that they believed termination of Jessica's and Allen's parental rights was warranted. Each doubted the couple's ability to care for the needs of A.M. Concerns were voiced about their ability to adequately supervise A.M., even when she was the only child they were caring for, and their ability to grasp and internalize the basic skills required to care for a young child. The witnesses testified that a strong bond existed between the parents and A.M., the parents loved and wanted to care for A.M., and

---

[5]As noted by the court of appeals, the February 2013 child placement plan for A.M. continued to have the box checked signifying there was "a good prognosis for rehabilitation of the . . . parental condition that would enable the child to return safely home." However, this was clearly no longer DHS's recommendation as of February 2013. The child placement plan appears to have been a carryover that DHS had simply failed to update.

both Jessica and Allen participated in the many programs and services offered to them. However, these same witnesses expressed concern that sufficient progress had not been made and that additional programs and services were not reasonably likely to prepare Jessica and Allen to care for A.M. in a timeframe that met A.M.'s need for permanency.

This view, shared by all the service providers who testified, was reflected in the testimony of the DHS caseworker:

> I think that Jessica and Allen could potentially, with more time, be able to have the kids returned to them. However, we have a legal obligation to address permanency for the amount of time that the kids have been out of the home, and that obligation doesn't really afford us the opportunity to give them more time regardless of them being lower functioning and some of the needs that they have.

None of the service providers believed that Jessica and Allen could safely and adequately care for A.M. if she was returned to them at the time of the trial. While some of the witnesses thought the couple might be able to care for A.M. in time, none believed that they could care for A.M. without requiring additional services for the foreseeable future.

Both Jessica and Allen testified that they thought they could care for A.M. However, Jessica agreed that more services would be necessary for them to do so, and Allen agreed that services would be helpful. On the stand, Jessica testified as follows:

> Q: What do you feel that you would need in order to have [A.M.] in your care full-time? A: I know I have talked with the worker about—named Wanda, we talked about she feels that we could take care of her as long as we have like a worker there to guide us, help us a little bit, being supportive about what we are doing and go on from there.
>
> Q: So you think you would still need some drop-ins? A: Yes.
>
> Q: And what do you think the drop-ins would do for you? A: A little bit for parenting, like if we need—like

anything that we need from them, we can always ask them. If we need any other services that they want us to have.

Allen testified on direct examination that the couple did not need services but would accept them:

> Q: Would you voluntarily participate in [parenting instruction] if [A.M.] were returned to your care?  A: Yes.
>
> Q: And would you agree to have random drop-ins if [A.M.] was returned to your care?  A: If it helps out, yes.
>
> Q: Do you think that's necessary?  A: Honestly, no, but if it helps then I can't back down from just free help.

However, on cross-examination, he seemed to indicate services would be necessary in order to properly care for A.M.:

> Q: What do you think you guys need in order to have [A.M.] in your care?  A: Well, nobody is a perfect parent, but if I had [A.M.] in my care, I could be a little bit more help as we progress over the year.  As I said, I'm a new father and I still have a lot to learn.
>
> . . . .
>
> Q: So in your opinion you feel [A.M.] could be returned to you and Jessica's care today as long as you had someone still coming to the home to help you out?  A: Yes.
>
> Q: And how frequently would this person have to come to your house?  A: It depends.  I don't know exactly how well we will do.  I know we are good parents, we do take care of her and her needs are met, but I do need a crib and I need baby gates, but we do keep an eye on her.  But it depends on how they come out, we will have to schedule, I guess.
>
> Q: Would you want this person to come at least once a day?  A: Once a day, probably twice. . . .

On redirect, Allen again indicated he thought services were desirable, but not necessary:

> Q: [Y]ou mentioned that you want to have someone come once a day or once every other day.  Do you think that would be necessary for the return of the child, or just something you'd want?  A: It's not necessary, but just to be on the safe side, you know, to help things out a little bit.  I

can see something like that happening, but it's not something that I believe in having.

> Q: So you would like it, but . . . you don't think it's absolutely necessary? A: Yeah.

The couple had never advanced beyond semisupervised visitation with A.M. after nearly a year of services. They had received support from numerous service providers: mental health services and medication management from the Abbe Center and Mental Health and Development Disabilities; parenting classes from Young Parents Network; budgeting assistance from Horizons; supervised visitation, drop-in services, parenting support, and assistance with meeting case goals from Tanager Place and Linn County Home Health; monthly mentoring from a Parent Partner; testing from the University of Iowa; and monthly Family Team meetings with all of the service providers to discuss progress, areas in need of improvement, and overall goals.

On August 13, the juvenile court entered an order terminating Jessica's and Allen's parental rights to A.M. pursuant to Iowa Code section 232.116(1)(*h*).[6] The court also terminated Jessica's parental rights to S.O. Among other things, with respect to A.M., the court noted the following:

> Jessica and Allen would like to resume care of [A.M.]. They have made efforts to do so. Unfortunately, they continue to lack the skills and ability to care for a child on a consistent, full-time basis. This is not likely to change in the reasonably near future, even with services. For [A.M.] to safely reside with her parents, the Department of Human Services would need to provide significant oversight for into the foreseeable future to assure the child's health and safety.

---

[6]During the time period between the March 2013 termination trial and the August 2013 termination order, the juvenile court conducted a further in-court review after receiving additional reports from DHS and the GAL. The reports were generally consistent with the evidence presented at trial. The record does not indicate that the court relied on these subsequent reports in its termination order.

Allen and Jessica clearly love [A.M.] and want to maintain their role as her parents. Sadly, they do not have the capacity to provide the care and supervision she would need to be safe. While they have a willingness to continue to try to become full time caretakers for the children, and they have made some progress, that progress has been slow. The legislature has established time frames to balance the need to provide parents with a reasonable opportunity to resume care of their children and the children's long term best interests. Children cannot be required to wait endlessly for the parents to be able to care for them.

[A.M.] needs the permanency and security that adoption can provide her. Her grandparents would like to adopt her along with [S.O]. The grandparents will allow an ongoing relationship between the children and Jessica and Allen which will keep the children safe and provide for their physical and developmental needs. This outcome is in the best interests of the children. The Court finds that none of the exceptions to termination as set out in section 232.116(3) apply to these proceedings. The Court finds, therefore, that termination of parental rights and placement in an adoptive placement with their grandparents is in the best interest of these children.

Both Jessica and Allen appealed the order terminating their rights to A.M.[7] The parents argued the State had failed to establish the grounds for the termination by clear and convincing evidence and that termination was not in A.M's best interests.[8] We transferred the case to the court of appeals, which reversed the termination order.

The court of appeals found the State had not established the grounds for termination by clear and convincing evidence. It pointed out that there was "no concern here regarding physical or emotional abuse of the child," "parental substance use or abuse," "domestic violence or domestic abuse," or "neglect." The court added, "[T]here does not even appear to be any particular concern regarding any probable or non-

---

[7]Jessica did not appeal the termination of her parental rights to S.O.

[8]Jessica and Allen also urged briefly that termination of parental rights to A.M. should not occur because of the closeness of the parent–child bond.

speculative harm to A.M." The court acknowledged the State's apprehension that "Jessica and Allen's mental health history and low mental functioning will preclude them from providing proper care and supervision," but the court saw "no evidence Jessica or Allen's mental health conditions or intellectual limitations create the type of statutory harm that would justify termination of parental rights."

The court observed that Jessica and Allen had provided stability for A.M. by obtaining employment and housing and actively and consistently participating in the programs and services offered to them. The court criticized the State's reliance on "trivial incidents" such as the presence of a floor fan on the floor of Jessica and Allen's apartment. The court concluded:

> The unspecific, nebulous concerns voiced by the service providers do not rise to the level of clear and convincing evidence the child would be subject to adjudicatory harm if returned to her parents. The few, specific examples raised by the State, individually and collectively, do not constitute clear and convincing evidence that the child would be subject to adjudicatory harm if returned to her parents.

One member of the panel dissented. She believed the State had proved by clear and convincing evidence that "A.M. cannot be returned to her parents' care at the present time." She noted the testimony from the service providers and DHS caseworker indicated it was "the totality of the parents' circumstances and overall lack of abilities that prevent them from safely and adequately parenting A.M." She also found that termination was in A.M.'s best interests.

We granted the State's application for further review.

## II. Standard of Review.

We review proceedings terminating parental rights de novo. *In re D.W.,* 791 N.W.2d 703, 706 (Iowa 2010). "We are not bound by the

juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.*

### III. Analysis.

**A. Grounds for Termination.** Under Iowa Code section 232.116(1)(*h*), the court may terminate the rights of a parent to a child if: (1) the child is three years old or younger, (2) the child has been adjudicated a CINA under section 232.96, (3) the child has been out of the parent's custody for at least six of the last twelve months or the last six consecutive months, and (4) "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." Iowa Code § 232.116(1)(*h*).

There is no question that A.M. meets the first three requirements. She was just over a year old at the time of trial, had been adjudicated CINA in March of 2012, and had been out of the custody of her parents since two days after her birth. At issue is whether she could be returned to the custody of her parents under section 232.102 at the time of the hearing. *See id.*; *In re D.W.*, 791 N.W.2d at 707 ("Section 232.116(1)(*h*) provides that termination may be ordered when there is clear and convincing evidence that a child under the age of three who has been adjudicated a CINA and removed from the parents' care for at least the last six consecutive months cannot be returned to the parents' custody at the time of the termination hearing.").

This is a difficult case. As the court of appeals pointed out, it does not present any of the usual precursors to termination of parental rights, such as physical or emotional abuse of the child, substance abuse by one or both parents, domestic abuse, parental criminal conduct, or even

overt neglect.[9]  Also, no one disputes that the parents care deeply for A.M. or that they had made progress by the time of the termination trial.

On the other hand, the record indicates that after a year of services, the parents were still not in a position to care for A.M. without ongoing DHS involvement.  A.M. had never stayed overnight with them.  The DHS caseworker, all the service providers, and the GAL recommended termination.  *See In re D.W.*, 791 N.W.2d at 707 (noting that "[t]he service providers and the guardian ad litem were unable to recommend reunification").  Both parents conceded that they would still want to have regular drop-ins at their home if A.M. were entrusted to their care.  They had no criticism of the services they had been provided.

As we have previously noted, "[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests."  *Id.* at 707.  In this case, involving an infant less than four years old, the statutory timeframe is six months.  *See* Iowa Code § 232.116(*h*)(3).  A.M. had been away from her parents for over a year, virtually since she was born.  If a child cannot be returned to the parents at that point, termination should occur so long as it is in the best interests of the child and the juvenile court does not find an exception to termination that warrants a different result.  *See In re P.L.*, 778 N.W.2d 33, 37–38 (Iowa 2010).

We have said that a parent's "lower mental functioning alone is not sufficient grounds for termination."  *In re D.W.*, 791 N.W.2d at 708.  But where it affects the child's well-being, it can be a relevant consideration.  *See id.*; *accord* Iowa Code § 232.116(2)(*a*).  We also second the

---

[9]But the same observation could have been made a year ago when A.M. was adjudicated CINA.  Ultimately, the issue is not parental culpability but whether the statutory requirements have been met.

observation of the court of appeals that termination cannot be based "on economic factors *alone*." *In re Z.T.D.*, 478 N.W.2d 426, 428 (Iowa Ct. App. 1991). However, in this case, the parents' overall decision making, not their level of resources, was the fundamental problem. *See In re P.L.*, 778 N.W.2d at 41 (emphasizing that the father's "poor decision making makes him unable to provide a safe and nurturing home for his child"). As the dissenting judge put it, "It is clear neither the mother nor father can internalize the necessary skills to keep A.M. safe and developing properly without the hovering supervision of DHS workers."

We agree with the court of appeals majority that some of the individual incidents cited by DHS may seem trivial and other concerns may appear to be nebulous. Yet this evidence needs to be put in the appropriate context. The only opportunity for evaluating Jessica's and Allen's parenting came during the supervised and semisupervised visits, because the couple never progressed to a trial period with A.M. at home. Thus, inferences had to be drawn as to how safe A.M. would be with Jessica and Allen based upon limited data points. When Jessica and Allen demonstrated through their own behavior that taking prescribed medications regularly was not always a personal priority, this naturally led to the inference they might not administer A.M.'s medications regularly. It is significant to us that neither the third-party service providers nor the GAL believed A.M. could be safely returned to her parents at the time of trial.

The juvenile court's comments on the parents' abilities appropriately summarize our concerns:

> Very little sustained progress has been made in addressing the issues which led to the children's removal. The parents have made effort and have, at times, shown progress in attaining the necessary skills and abilities. However, they

have not shown the ability to retain those skills or to transfer the learned skills to new situations which occur as the children develop.

The record thus shows A.M. could not be returned to the care of her parents at the time of the hearing. We find clear and convincing evidence that grounds for termination of Jessica's and Allen's parental rights were established under Iowa Code section 232.116(1)(*h*).

**B. Best Interests of the Child.** "Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests." *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012); *accord* Iowa Code § 232.116(2). We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *accord In re P.L.*, 778 N.W.2d at 40. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *Id.* Taking into account these factors, we conclude termination is in A.M.'s best interests.

The record shows that A.M. is adoptable, is doing well in the care of her maternal grandparents, and has formed a bond with them. At the time of trial, the grandparents had received their foster care license and were under consideration as the adoptive placement for A.M. and S.O. *See In re D.W.*, 791 N.W.2d at 709 (citing the child's preadoptive placement as a factor favoring termination under section 232.116(2)). Additionally, by remaining in the care of her grandparents, A.M. can continue to develop the close bond she has formed with her half-brother, S.O. Furthermore, the maternal grandmother stated that she intends to

allow the parents to continue a relationship with A.M. if the child is permanently placed in the grandparents' home. Also, she expressed a willingness to work with A.L.'s father to ensure that A.M. continues to have a relationship with her other half-brother.

A.M. has never been in the full-time care of either parent. She was removed from their custody before she ever left the hospital and has spent her entire life in the care of a foster family and then her maternal grandparents. She has never had a permanent home. Termination will enable her to achieve permanency. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and her "need for a permanent home"). We agree with the juvenile court that termination is in A.M.'s best interests. *See In re D.W.*, 791 N.W.2d at 707 ("We do not gamble with the children's future by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (Internal quotation marks omitted.)).

**C. Potential Grounds Not to Terminate.** Section 232.116(3) provides that "[t]he court need not terminate the relationship between the parent and child" under certain circumstances. Iowa Code § 232.116(3). A finding under subsection 3 allows the court not to terminate. *See In re P.L.*, 778 N.W.2d at 39. "The factors weighing against termination in section 232.116(3) are permissive, not mandatory," and the court may use its discretion, "based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011).

The juvenile court found "none of the exceptions to termination as set out in section 232.116(3)" applied to this case. We agree. Although

section 232.116(3)(*a*) allows the juvenile court not to terminate when a "relative has legal custody of the child," Iowa Code § 232.116(3)(*a*), A.M. is not in the legal custody of her grandparents. And, while section 232.116(3)(*c*) allows the juvenile court not to terminate when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship," we are not persuaded this is such a case. *Id.* § 232.116(3)(*c*). A.M. was just over a year old at the time of trial, and the record indicates she also has a close bond to her maternal grandparents, with whom she has spent much more time.

**IV. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals and affirm the juvenile court's order terminating Jessica's and Allen's parental rights to A.M.

**COURT OF APPEALS DECISION VACATED; JUVENILE COURT ORDER AFFIRMED.**