# IN THE COURT OF APPEALS OF IOWA

No. 19-0334
Filed June 5, 2019

**IN THE INTEREST OF C.M.,**
**Minor Child,**

**N.P., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Des Moines County, Jennifer S. Bailey, District Associate Judge.

A father appeals the termination of his parental rights to his two-year-old son. **AFFIRMED.**

Travis A. Inghram of Inghram Law, PLLC, Burlington, for appellant father.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Josh Schier of Cray Law Firm, Burlington, guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Nathan challenges the juvenile court's order terminating his parental relationship with two-year-old C.M.  C.M.'s mother, Angel, and Nathan cared for C.M. until the Iowa Department of Human Services (DHS) intervened in April 2018.  The juvenile court terminated Nathan's parental rights in February 2019.[1]  Nathan appeals, seeking additional time to establish a relationship with C.M. and arguing termination will be detrimental to C.M. because of the close bond he and C.M. share.  After our independent review of the record,[2] we agree with the juvenile court's conclusion termination is warranted.

**I.      Background Facts and Proceedings**

Nathan and Angel shared a nine-year relationship and had a child, C.M., together in January 2017.  When C.M. was born, Angel was still married to Joshua, making Joshua C.M.'s legal father.[3]  Nathan was incarcerated for the first six months of C.M.'s life.  But when Nathan was released in July 2017, he "went straight to [Angel's] apartment" and began playing an active role in C.M.'s

---

[1] The order also terminated parental rights of Angel and Joshua, the child's legal father. They are not parties to this appeal.

[2] We review child-welfare cases de novo.  *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016) (citing *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014)).  We give weight to the juvenile court's fact findings, particularly those regarding witness credibility, but we are not bound by them.  *Id.* (quoting *A.M.*, 843 N.W.2d at 110).  Termination must be supported by clear and convincing evidence—meaning we have no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence."  *Id.* (alteration in original) (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).

[3] Caseworker Amy Glasgow testified Angel remained married to Joshua because "they haven't been able to pull together the amount of money or he hasn't cooperated for Angel to be able to [end the marriage]."

caretaking.[4] The DHS intervened[5] after C.M. tested positive for amphetamine during a medical appointment in April 2018. The juvenile court granted the DHS request for temporary removal of C.M. based on concerns Angel and Nathan were using illegal substances while caring for C.M.[6] C.M. has since been in foster care.

At an early-May 2018 hearing, the juvenile court adjudicated C.M. a child in need of assistance (CINA) and directed Nathan to obtain DHS-recommended mental-health and substance-abuse evaluations, submit to random drug testing, and participate in Family Safety, Risk, and Permanency (FSRP) services, family team meetings, and visitation with C.M. For a short time after the hearing, Nathan accompanied Angel to visitations with C.M. and seemed amenable to DHS services. But toward the end of the month, Nathan stopped showing up for the scheduled visits. And when FSRP care coordinator Kimberly Young asked Angel where Nathan was, Angel said she hadn't heard from him.[7] Despite the DHS mailing communications to Nathan at the address he provided (his mother's address), Nathan's involvement with C.M.'s case came to a halt.

In October 2018, the State petitioned to terminate parental rights. Then, in early December, Nathan resurfaced—he penned a letter to the DHS from the

---

[4] Angel testified Nathan bonded with C.M., had a "cordial relationship [with Angel] centered around [C.M.]'s wellbeing," "brought [C.M.] diapers and wipes," and was involved with C.M.'s medical care.

[5] While this marked the first DHS intervention related to C.M., the DHS was previously involved with the family after learning Angel permitted Nathan, a convicted sex offender, access to C.M.'s older half-sister and remained involved with the family due to Angel's drug use. C.M. was born while Angel underwent drug treatment.

[6] Nathan denied ever using methamphetamine but admitted to recreational marijuana use.

[7] Later, Angel told caseworkers she thought Nathan might be in Fort Dodge, Iowa, attempting to evade an Illinois arrest warrant. Nathan later clarified no warrant was issued for his arrest until November 2018.

Hancock County Jail in Carthage, Illinois, asking the DHS to communicate with him about C.M.

The court set the termination hearing for January 15, 2019.[8] On January 8, Nathan moved to continue the termination hearing to allow time for his paternity test scheduled for January 17. The juvenile court denied Nathan's motion, citing Nathan's delay in obtaining paternity testing and failure to participate in hearings or services. After the hearing,[9] the court terminated Nathan's parental rights under Iowa Code section 232.116(1)(b), (e), and (h) (2018).

Nathan appeals the juvenile court's termination order.

## II. Analysis

### A. Additional Time

Nathan contends he should have been given more time for reunification.[10] He points to his bond with C.M. and asserts he needed additional time to "receive paternity results and subsequently foster reunification with [Nathan] since efforts with [Angel] failed."

---

[8] The hearing was initially set for mid-December, but the court continued it to mid-January due to scheduling issues and concerns about whether Nathan received adequate notice.

[9] While the hearing was held before Nathan submitted to paternity testing, the court did not issue its order until after it received the paternity test results on February 5. The court acknowledged Nathan's status as biological father of C.M. in its order terminating his rights.

[10] Nathan cites Iowa Code section 232.117(5) in his petition on appeal, arguing the statutory provision "allows the court to continue CINA adjudication rather than termination of parental rights in order to further attempt reunification." But Nathan misses the purpose of section 232.117(5)—to give the court an option when it chooses not to terminate parental rights. Here, the court *did* terminate Nathan's parental rights, so section 232.117(5) does not apply. Because Nathan appears to argue on appeal the juvenile court should have continued placement for an additional six months as permitted by Iowa Code section 232.104(2)(b), we address that argument.

Iowa Code section 232.104(2)(b) permits the court to:

> [e]nter an order pursuant to section 232.102 to continue placement of the child for an additional six months at which time the court shall hold a hearing to consider modification of its permanency order. An order entered under this paragraph shall enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period.

While Nathan insists the court should have allowed more time for him to reunify with C.M. after the completion of his paternity testing, Nathan ignores the fact he contributed to the belated determination. Nathan could have completed the paternity testing any time during the CINA proceedings. But even if we were to ignore the self-inflicted nature of the delays in establishing Nathan's paternity, Nathan does not explain how the test results would alleviate the risk of the adjudicatory harm stemming from his abandonment of C.M.[11] Nathan acknowledged throughout the case he was C.M.'s biological father[12]. And he does not suggest the paternity test results would change the nature of their relationship or prompt him to engage in services recommended by the DHS. Although Nathan argues he debunked Angel's allegation he was evading a warrant during his six-month absence, Nathan did not explain his departure from C.M.'s life. Nor did

---

[11] In his close-bond argument, Nathan contends "Evidence has been offered that [Nathan] was not the legal father and was unable to have [C.M.] placed with him pending the outcome of paternity testing." But during the termination hearing, Nathan acknowledged he could not presently care for C.M. because he was incarcerated—not due to his lack of legal status as C.M.'s father.

[12] In an October 2018 permanency order, the district court stated: "The department did initially have contact information for Nathan and he does know how to reach the on-going worker, but he has never availed himself of paternity testing, nor participated in services. For all intents and purposes, [C.M.] has only one parent in his life, which is Angel."

Nathan complete a mental-health or substance-abuse evaluation or comply with any other services offered by DHS and ordered by the court.

C.M. should not have to continue waiting for permanency. *See A.M.*, 843 N.W.2d at 112 ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child."). We find no facts in the record indicating a six-month delay would lead to safe reunification. *See* Iowa Code § 232.104(2)(b).

**B. Exception to Termination.**

Iowa Code section 232.116(3)(c) permits the court to avoid termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."

Nathan argues termination will be detrimental to C.M. because Nathan "is the only father figure [C.M.] ever knew." We are not persuaded by Nathan's argument. Glasgow, the family's caseworker, testified C.M. was developing relationships with his current foster family and was "very comfortable" in their home. While we recognize Nathan and C.M. shared a bond early in C.M.'s life, the record does not suggest C.M. would be disadvantaged by termination or that the resulting detriment is great enough to outweigh the continuing risk of Nathan's inability to provide a safe and stable home for C.M. *D.W.*, 791 N.W.2d at 709.

We see no basis for reversal of the termination order.

**AFFIRMED.**