# IN THE COURT OF APPEALS OF IOWA

———————————

No. 26-0596
Filed June 10, 2026

———————————

**In the Interest of P.H.-S., Minor Child,**

**C.S., Father,**
Appellant.

———————————

Appeal from the Iowa District Court for Crawford County,
The Honorable Kristal L. Phillips, Judge.

———————————

**AFFIRMED**

———————————

Eric D. Puryear and Eric S. Mail of Puryear Law P.C., Davenport, attorneys
for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, attorneys for appellee State.

Justin F. Reininger of Boerner & Goldsmith Law Firm, P.C., Ida Grove,
attorney and guardian ad litem for minor child.

———————————

Considered without oral argument
by Greer, P.J., and Buller and Langholz, JJ.
Opinion by Langholz, J.

1

**LANGHOLZ, Judge.**

A father appeals the juvenile court's termination of his parental rights to his five-year-old daughter.[1] He argues only that the court should have instead closed the case with a bridge order placing the daughter in her mother's legal custody with continued supervised visitation for the father. On our de novo review, we agree with the juvenile court that the case could not safely close with a bridge order and that entry of a bridge order would not be in the daughter's best interest. We thus affirm the juvenile court's order terminating the father's parental rights to the daughter.

This family came to the attention of the Iowa Department of Health and Human Services ("HHS") in September 2024, when HHS received a report that the father was using methamphetamine while caring for the daughter. At the time, the father and mother were separated and informally equally sharing the physical care of the then-three-year-old daughter. The daughter tested positive for methamphetamine and amphetamine. The father's girlfriend tested positive for methamphetamine. And the father repeatedly refused to submit to drug testing. He admitted that he had used methamphetamine six months before but claimed the daughter's positive test was because of his girlfriend and that he would also test positive because of his contact with the girlfriend and others who use drugs.

Initially, HHS told the father he could not have unsupervised contact with the daughter until he complied with their request for a drug test. But in late October, the father texted the HHS worker that he was going to the mother's house to take the daughter. And he indeed showed up at her house

---

[1] We avoid using the parties' names to respect their privacy because this opinion—unlike the juvenile court's order—is public. *Compare* Iowa Code § 232.147(2) (2025), *with id.* §§ 602.4301(2), 602.5110; *see also* Iowa Ct. R. 21.25.

and did not leave until law enforcement responded. So the State filed this child-in-need-of-assistance case. And the juvenile court removed the daughter from the father's custody, leaving her in the mother's custody.

Over the next seventeen months, the father made little progress addressing these issues that led to the removal. He repeatedly refused HHS's ongoing requests to submit to drug testing or to complete substance-use and mental-health evaluations as ordered by the juvenile court.[2] And he peppered HHS workers with angry and inappropriate texts and emails.

Shortly after this case started, the father was charged with stalking and harassing the mother for his conduct in October and with child endangerment for his exposure of the daughter to methamphetamine. The criminal case remained pending at the time of the termination hearing. It also resulted in the entry of a no-contact order protecting the mother that was still in effect. And because of the father's failure to comply with the conditions of his pretrial release in that case—including repeatedly failing to meet with the probation officer and consuming alcohol—the district court found the father in contempt a couple of weeks before the termination hearing. So the court sentenced him to 180 days in jail and suspended all but seven days of the sentence to motivate the father to begin complying with his pretrial-release supervision.

When the father attends visits, they have generally gone well, with the daughter showing a close and positive relationship with him. But the father

---

[2] As a part of the pretrial-release supervision in his criminal case, the father did submit to drug testing in November 2025 that was negative for all substances. And a couple of days before the termination hearing, the father arranged his own urine drug test through a provider in the Des Moines area that came back negative. He also submitted to a hair test, but the results had not been returned by the time of the hearing.

almost always arrives about fifteen minutes late to the visits. And when he is much later than that—which occurs not infrequently—the visits do not happen at all.[3] The uncertainty of whether the father will arrive causes the daughter much anxiety—the night before visits and while waiting to see if he will arrive—and distress when he does not arrive. Indeed, shortly before the termination trial, the father missed the visit scheduled on the daughter's birthday. And another visit had to end early after the father became agitated when the visit supervisor tried to redirect him from talking to the daughter about how "he might have to go to jail" and telling her "that people were lying about things."

At the March 2026 termination hearing, much of the focus was on whether a bridge order that permitted the father to continue to have some visitation could be an appropriate alternative to termination. The father argued that a bridge order would let the daughter retain a relationship with him and protect her by letting the mother "say there's not going to be any sort of visits as long as there's not a drug test" and that "he would comply with those testing requirements." The State disagreed, arguing that termination was in the daughter's best interest and highlighting "that the father has had just a continuous disregard for the orders from the juvenile court" and the criminal court. The daughter's guardian ad litem also recommended termination because "that's the only outcome . . . that doesn't put [the daughter] in a continued state of turmoil" and because of his concerns "with the logistics of how a bridge order would work."

The mother too testified that she believed termination of the father's parental rights was in the daughter's best interest and that she did not believe

---

[3] A supervisor of visits during the later part of the case said that during the time she was involved, the father had attended about forty-two visits and missed about ten.

a bridge order would work. She did not believe the father would comply with her requests for drug tests, expressed concerns that he would react negatively and her "phone would be blowing up like it used to," and shared that she would not feel safe. She also testified about her reservations as to whether the father's parents would have sufficient ability to control the conduct of the father or other family members to properly supervise visitation.

The juvenile court found that the State proved grounds for termination under paragraphs "e" and "f" of Iowa Code section 232.116(1) (2025) and that termination was in the daughter's best interest. The court also explained that because of the daughter's "bond with her father, this court has given [a] great deal of consideration to a bridge order in lieu of the termination of parental rights." But it reasoned "that a bridge order would only serve to transfer [the father's] vile and spiteful behavior from the Department to [the mother] and would not result in [the father] being any more engaged or consistent in visits which would only lead to continued instability and uncertainty for" the daughter. The court also declined to apply any of the permissive statutory exceptions to termination. And so, the court terminated the father's parental rights to the daughter. The father now appeals.

The father argues that rather than terminating his parental rights, the juvenile court should have closed the child-in-need-of-assistance case with a bridge order placing the daughter in her mother's legal custody while still granting him visitation rights.[4] *See* Iowa Code § 232.103A(1) (authorizing the juvenile court to "close a child in need of assistance case by transferring jurisdiction over the child's custody, physical care, and visitation to the

---

[4] On appeal, the father does not specify the precise terms of the bridge order he urges we should enter. But in the juvenile court, he requested a bridge order "giving Mom the ability to make all important decision[s]" for the daughter and sought only visitation.

district court through a bridge order" when certain criteria are met). We review the juvenile court's decision de novo, giving "respectful consideration" to the court's factual findings, especially when based on credibility determinations. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

One of the requirements for entering a bridge order is the court's determination "that the child in need of assistance case can safely close once orders for custody, physical care, and visitation are entered by the district court." Iowa Code § 232.103A(1)(e). We must also consider the child's best interest. *See id.* §§ 232.116(2), 232.1. And we are mindful that "[e]ntry of a bridge order is not the preferred solution when there is long-standing discord between the parents." *In re I.L.*, No. 25-0477, 2025 WL 2538875, at *4 (Iowa Ct. App. Sep. 4, 2025); *see also In re W.H.*, No. 24-2073, 2025 WL 708347, at *3 (Iowa Ct. App. Mar. 5, 2025) ("A bridge order, at bottom, requires two parents to work together to arrange custody, physical care, and visitation.").

Because of the father's limited progress during this case, we cannot find that the case could have safely closed with a bridge order. His visitation was still only supervised. And his apparent unwillingness or inability to consistently arrive on time to the visitation—or sometimes to even attend at all—has harmed the daughter. A no-contact order still protected the mother from any contact with the father at the time of the termination hearing. And the father still had pending criminal charges—including for stalking and harassing the mother in October 2024 in the lead-up to this case. He failed to comply with the requirements of his pretrial release in that case on multiple occasions—resulting in the court finding him in contempt. So too did he fail to comply with HHS's repeated requests for him to submit to drug testing and to complete substance-use and mental-health evaluations.

6

Like the juvenile court, we thus see little prospect that the father could cooperate with the mother to coordinate visitation. He essentially asked the court to trust that his behavior would be better with the mother enforcing the drug-testing and supervision requirements for visitation rather than HHS. But past actions are often the best predictor of future behavior. *See In re T.B.*, 604 N.W.2d 660, 662 (Iowa 2000) ("The future can be gleaned from evidence of the parents' past performance and motivations."). And especially given the already-challenging relationship between the parents, we see no reason to believe that the father would be more compliant with a bridge order than he has been for the past seventeen months of this case or his conditions of pretrial release in his criminal case.

This probable continued discord between the parents is not in the daughter's best interest. *See In re K.J.*, No. 26-0373, 2026 WL 1162655, at *3 (Iowa Ct. App. Apr. 29, 2026). Neither is it in the daughter's best interest to be subjected to continued anxiety and stress about whether the father would actually attend his scheduled visitation. While it is apparent that the daughter and father love each other and have a close bond, it is not in the daughter's best interest to continue to wait in the hopes that "someday [the father] will learn to be a parent." *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (cleaned up).

We thus affirm the juvenile court's decision to terminate the father's parental rights rather than closing the case with a bridge order.

**AFFIRMED.**