# IN THE COURT OF APPEALS OF IOWA

No. 15-1781
Filed January 13, 2016

**IN THE INEREST OF J.E.,**
**Minor Child,**

**L.E., Mother,**
**Appellant.**
_____

Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block, Associate Juvenile Judge.

A mother appeals from the termination of her parental rights.  **AFFIRMED.**

D. Raymond Walton of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellant mother.

Thomas J. Miller, Attorney General, and Janet L. Hoffman, Assistant Attorneys General, for appellee State.

David Zellhoefer of Zellhoefer Law Offices, Waterloo, attorney and guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Following a contested hearing on August 5, 2015, the juvenile court ordered termination of L.E.'s parental rights to her child, J.E., born in May 2014. The court, employing the proper three-step analysis, *see In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010), found the State proved grounds for termination under Iowa Code section 232.116(1) paragraphs (g) and (h) (2015), termination of the mother's parental rights was in the child's best interests, and none of the exceptions set forth in section 232.116(3) applied. The mother now appeals, arguing the court inappropriately based its order on her mental disability, as well as challenging some of the court's other findings. Our review is de novo. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

**GROUNDS FOR TERMINATION.** The juvenile court cited two independent grounds for termination under Iowa Code section 232.116(1), and we may affirm on either ground on appeal if the ground is supported by clear and convincing evidence. *See D.W.*, 791 N.W.2d at 707. We choose to address the ground found under Iowa Code section 232.116(1) paragraph (h). Under (h), the court may terminate the rights of a parent to a child if: (1) the child is three years old or younger, (2) the child has been adjudicated a child in need of assistance under section 232.96, (3) the child has been out of the parent's custody for at least six of the last twelve months or the last six consecutive months, and (4) "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." Iowa Code § 232.116(1)(h). There is no dispute that the child meets the first three requirements. At issue is whether the child could be returned to the

mother's custody under section 232.102 at the time of the hearing. *See id.*; *D.W.*, 791 N.W.2d at 707.

It is true that a parent's "lower mental functioning alone is not sufficient grounds for termination." *D.W.*, 791 N.W.2d at 708. "But where it affects the child's well-being, it can be a relevant consideration." *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014). In this case, it is the mother's overall decision making and inability to adapt to new, spontaneous situations that is the fundamental problem. *See P.L.*, 778 N.W.2d at 41 (emphasizing that the father's "poor decision making makes him unable to provide a safe and nurturing home for his child"). Following the mother's 2014 psychological evaluation, the mother's psychologist opined she was concerned the mother had not improved "in her presentation and ability to flexibly problem-solve for her child, compared to when she was assessed for parental fitness" in 2012 for her other child, to whom the mother's parental rights were subsequently terminated. The psychologist explained in her evaluation:

> As before, [the mother] continues to have difficulty separating her child's needs from her own; this was evident from the current interview as well as from an assessment conducted in February 2012. [The mother] has appropriately sought out community service providers to assist her in developing parenting skills; however, it is not likely that she would ever be able to develop the skills, knowledge, and cognitive flexibility to terminate [the need for] such services. As was documented in [the 2012] report, [the mother] has not yet had to manage her son while she or her son are experiencing stressful circumstances (such as lack of sleep, emotional duress, novel situations that naturally [occur] as children age). It is evident from the observation and the testing that [the mother] is working hard to learn specific parenting skills that are age-appropriate; however, she is likely not able to flexibly or instinctively respond to her child as he ages due to her cognitive limitations, historic challenges with inattention and impulsive behavior, and ongoing mental health concerns.

The mother herself expressed concerns to the psychologist "about her ability to parent [the child] without extensive assistance from varying community programs." Because the mother "continues to struggle with flexible problem solving important for independent parenting," the psychologist opined the mother could not be an independent provider for the child and recommended the child remain in the custody of the Iowa Department of Human Services or alternative providers.

The mother's own guardian testified the mother had problems meeting her own needs without regular assistance, noting the mother struggled "with following through with instructions and understanding the intent when it comes to medical recommendations" and even staying "hydrated and eating appropriately" without staff supervision. The guardian believed the mother was "going to continue to need support for her in order for her to be able to take care of her ongoing medical and psychiatric needs," and she testified that she believed if the child were placed in the mother's custody, it "would become overwhelming" for the mother. Though the mother "tries very hard to listen to what's being conveyed to her but she struggles with . . . following through with what the recommendations are." One example was the mother's independent decision to go outside her normal medical providers to have her birth control implant removed. The mother failed to give the other medical providers "the current information on that and removed the [implant] and placed her on the birth control pill. Within two weeks she suffered a pulmonary embolism." The mother reported to the psychologist that she had the implant "removed because it 'moved' in her arm and was no

longer effective," and she became pregnant with J.E. when she took her birth control "pill 'a half-hour later' than she was supposed to."

Finally, the child's guardian ad litem recommended termination of the mother's parental rights, noting the mother

> chooses inappropriate friends, people to hang around with. . . . Those are choices she made, but I don't know if she knows better. I think because of her intellectual disabilities she probably doesn't know better.
>
> She can't handle money. [The mother's guardian] testified, quite accurately, I think, that if you leave [the mother] on her own without an army of social workers and other well-meaning individuals she will fail. She will fail and fall hard. And I can't allow my client to be under her care and guidance when she does.
>
> I'm not saying she's a bad mother. I bet she's trying harder than half the mothers I've run into [in] my [thirty-five] years of doing this. But she just can't. It's impossible.

While there is no question the mother loves the child, it is clear the mother could not internalize the necessary skills to keep the child safe and developing properly without the constant intervention of a bevy of service providers. At least twice the child choked in the mother's care while a service provider was present and had to be told the child was choking. In these instances, the mother had turned away from the child and had her back to him, though it had been stressed to her that she needed to watch the child eat to make sure the child did not choke. The choking incidents, coupled with the mother's inability to care for her own needs, her inability to administer medication as directed, her continued relationships with unsavory and unsafe persons, such as her most recent boyfriend who was an acknowledged substance abuser, along with the mother's own doubts of her ability to care safely for the child despite the receipt of significant services, evidence the child could not be returned to her care at the

time of the termination-of-parental-rights hearing. We agree with the juvenile court that the State proved the ground for termination under Iowa Code section 232.116(1)(h).

**FACTORS IN TERMINATION.** "Having found statutory grounds for termination exist, we turn to further consider the circumstances described in section 232.116(2) that drive the actual decision-making process." *D.W.*, 791 N.W.2d at 708. Under section 232.116(2), we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Additionally, a parent's lower mental functioning is a relevant consideration in the best-interests analysis if the disability affects the parent's ability to provide for the needs of the child. *See D.W.*, 791 N.W.2d at 708 (citing Iowa Code § 232.116(2)(a)).

Upon our de novo review, we find the considerations guiding the decision support termination. The mother's lower mental functioning is a contributing factor to her inability to provide a safe and stable home for the child. *See id.* As the child continues to grow and develop, his needs will only become more challenging. The case progress reports and service providers' testimony indicate the mother has difficulty overcoming her intellectual impairment to adequately provide a safe and reliable home for the child, and even herself at times. Furthermore, the mother was unable to care for the child without relying heavily on service providers. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section

232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 40.

The record shows that the child is doing well with his foster family, who has also been very supportive of the mother. The child is adoptable and deserves a permanent home. Termination will enable him to achieve permanency. *See id.* at 113. Taking into account all of the relevant factors, we conclude termination is in the child's best interests. *See A.M.*, 843 N.W.2d at 112.

Because we agree with the juvenile court that the State proved a ground for termination and the record evidences termination is in the child's best interests, we affirm the juvenile court's ruling terminating the mother's parental rights.

**AFFIRMED.**