**IN THE COURT OF APPEALS OF IOWA**

No. 15-1587
Filed March 9, 2016

**IN THE INTEREST OF A.L.,**
**Minor Child,**

**B.L., Father,**
Appellant.

_____

Appeal from the Iowa District Court for Muscatine County, Gary P. Strausser, District Associate Judge.

A father appeals the termination of his parental rights to his child. **AFFIRMED.**

Jeffrey L. Powell of Law Office of Jeffrey L. Powell, Washington, for appellant father.

Thomas J. Miller, Attorney General, and Janet L. Hoffman and Kathrine S. Miller-Todd, Assistant Attorneys General, for appellee State.

Mark J. Neary of Neary Law Office, Muscatine, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**VAITHESWARAN, Presiding Judge.**

A father appeals the termination of his parental rights to his child, born in 2014. He contends the district court: (1) should not have terminated his parental rights; (2) should have granted him six additional months to work toward reunification; (3) should have placed the child in the guardianship of the child's great-grandmother; and (4) should have granted his motion to have the judge recused.

## I.    *Ground for Termination*

The district court terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(h) (2015), which requires proof of several elements including proof the child cannot be returned to the parent's custody. On our de novo review, we find clear and convincing evidence to support this ground for termination.

The father was incarcerated before the child's birth and remained incarcerated at the time of the termination hearing. He had an extensive criminal record dating back to 2003 and growing out of his addiction to illegal substances. In 2008, he was sentenced to prison on a burglary conviction. In time, he was paroled but committed another crime resulting in a conviction for manufacturing methamphetamine. The father returned to prison, was again paroled, and again committed a crime resulting in a conviction for first-degree theft. He was not slated to discharge his sentences until 2020. We conclude the child could not be returned to the father's custody at the time of the termination hearing. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa

2010) (noting section 232.2116(1)(h) requires proof the child "cannot be returned to the parents' custody at the time of the termination hearing").

## II.    Additional Time

The father contends the district court should have granted him six additional months to reunify with the child.  *See* Iowa Code §§ 232.104(2)(b), 232.117(5).  We disagree.

The father's incarceration prevented him from developing more than a superficial relationship with the child.  He saw the child for the first time at his sentencing hearing and exercised visits only in the supervised confines of prison institutions and only through the good will of the child's seventy-eight-year-old great-grandmother, who gained the department's approval to transport the child to prison twice a month.[1]

We recognize the father expected to appear before the parole board four months after the termination hearing and anticipated release to a halfway house or, possibly, to the child's great-grandmother's home.  However, he acknowledged the possibility of being denied parole.  And, even if he were released, a department of human services caseworker testified he would have to complete months of post-release services to prepare himself for reunification with the child.  She stated, "It would take a while for us to determine if he could be a safe place[ment] for [the child.]"  These additional services were necessary

---

[1] The father formally began visiting the child at the correctional facility housing him after his paternity was established and the department approved the great-grandmother's transportation request.  He was also allowed informal visits with the child during the thirty-day transitional period from the Oakdale Classification Center to the correctional facility.

despite the father's participation in prison programming designed to address his addictions and prepare him for release.

The father's track record also did not bode well for a successful transition. The father acknowledged failing a drug test in 2013 just two days after completing a drug treatment program. While he expressed a renewed commitment to sobriety, his commitment had not been retested in an unsecure setting. As the district court stated, "[H]is substance abuse issues are not likely to disappear."

We conclude the district court appropriately denied the father's request for six additional months to work toward reunification.

### III.    *Guardianship with Child's Great-Grandmother*

The father contends the department should have placed custody and guardianship with the child's great-grandmother. *See id.* § 232.117(3)(c) (allowing the court to transfer guardianship and custody of child to a relative). The department recommended this disposition. The caseworker testified her home had been found suitable, the child had a bond with her great-grandmother, and, if the father were released, the child's placement in this home "would give him the opportunity to see his daughter on a fairly regular basis."

Notwithstanding the department's position, the district court concluded guardianship with the great-grandmother was "not appropriate." The court explained the great-grandmother would be ninety-five when the child turned eighteen and it was "not realistic to believe that she [would] be able to parent [the child] throughout [the child's] childhood." The court also stated the great-

grandmother considered the placement temporary until the father was capable of caring for the child, leaving the child with "a permanent unsettled placement."

On our de novo review, we find the child's great-grandmother was willing to serve as a permanent placement for the child. She testified she wished to become the guardian but, alternatively, was willing to adopt the child. She stated she was in good health and had the ability to care for the child despite her age.

The extraordinary steps the great-grandmother took to maintain family ties included gaining approval for overnight visits with the child and approval for four-hour round trip visits to the prison. These steps reflected her abiding commitment to father and child.

Nonetheless, we conclude the district court acted appropriately in denying the request for guardianship and custody. While the great-grandmother testified she would make every effort to protect the child should the father fail to maintain his sobriety on release, she admitted she would be unable to force him to leave the home, if he chose to stay. This factor supports the district court's decision to deny the great-grandmother guardianship and custody of the child.

## IV. *Recusal*

The father contends the district court judge should have recused himself because "he and the Judge had argued during numerous criminal hearings, including times when [he] became angry and threatened to assault the judge in years past." Our review is for an abuse of discretion. *Taylor v. State*, 632 N.W.2d 891, 894 (Iowa 2001).

Iowa Rule of Judicial Conduct 51:2.11 states judges shall disqualify themselves "in any proceeding in which [their] impartiality might reasonably be

questioned," including where the judges have "a personal bias or prejudice concerning a party . . . ." "Impartiality" is defined as the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." Iowa Rule of Judicial Conduct 51.

When the father first filed his recusal motion, a judge not the subject of the motion ruled, "[T]here are not sufficient grounds stated in the application to require [the judge] to recuse himself in the matter." At a subsequent hearing, the judge subject to the motion allowed the father to recount an incident in 2010 when the judge changed his bond and the father attempted to "come behind the desk." The judge responded, "Are you sure that was me?" The father answered, "Yes." The judge then stated, "I'll tell you I don't remember it." The judge ruled,

> I don't recall the incidents you are making reference to. If I did it wouldn't make any difference for this motion. It's not unusual for people in jail to get upset and it's not unusual for people to be upset when they are talking about issues of children. I know that's not what you are referencing. I don't take it personally and I don't think there's any problem with me hearing the issues in this case.

The court followed up with a written order noting the motion to recuse was denied by another judge, and it was again being denied for the reasons stated on the record and because the father did not demonstrate "any personal bias by allegations of fact." The court continued, "The fact that the undersigned has had past contact with [the father] is not sufficient for recusal. All of the information presented by [the father] simply amounts to nothing more than the undersigned performing his function as a District Associate Judge."

We discern no abuse of discretion in this ruling. *See State v. Jason*, No. 14-1162, 2015 WL 6510334, at *6-7 (Iowa Ct. App. Oct. 28, 2015) (finding no indication the judge found threats credible or that judge was biased against defendant); *In re J.A.P.*, No. 09-0486, 2009 WL 4241795, at *4 (Iowa Ct. App. Nov. 25, 2009) (rejecting the argument that the judge who sentenced the parent to incarceration should have recused herself from hearing the termination action where there was no dispute the judge did not remember the plea and sentence). The judge's inability to recall the incident in question establishes that it could not have affected his impartiality. Accordingly, we affirm the district court's denial of the recusal motion.

We affirm the termination of the father's parental rights to his child.

**AFFIRMED.**