# IN THE COURT OF APPEALS OF IOWA

No. 17-0995
Filed September 27, 2017

**IN THE INTEREST OF C.E.,**
**Minor Child,**

**A.E., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Montgomery County, Amy L. Zacharias, District Associate Judge.

A mother appeals the termination of her parental rights to her now-one-year-old son.  **AFFIRMED.**

Justin R. Wyatt of Woods & Wyatt, P.L.L.C., Glenwood, for appellant mother.

Thomas J. Miller, Attorney General, and Ana Dixit, Assistant Attorney General, for appellee State.

Karen L. Mailander of Mailander Law Office, Anita, guardian ad litem for minor child.

Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

A mother, Ashley, appeals the juvenile court's order terminating her parental relationship with now-one-year-old C.E. Her main argument for reversal is that the Iowa Department of Human Services (DHS) placed too much emphasis on a September 2015 psychological evaluation expressing the pessimistic view that her parenting deficiencies would not improve over time. Ashley also contends the DHS incorrectly believed her speech impediment—a motor-skills disorder called apraxia—constituted an intellectual disability that hindered her parenting skills. After independently reviewing the record,[1] we conclude neither of those issues clouded the juvenile court's judgment in the child-welfare proceedings. Like the juvenile court, we find clear and convincing evidence in the record to support terminating Ashley's parental rights to her son.

## I.      Facts and Prior Proceedings

Born in late July 2016, C.E. was removed from the care of his mother while still in the hospital. The removal was prompted by the concerns of a child protection worker who had observed Ashley struggling to meet the basic needs of her older child, J.E., who had been previously removed from Ashley's care.[2] The child protection worker described Ashley's "disengagement" during interactions with J.E.—Ashley would "be texting even while feeding" the baby and

---

[1] We review termination-of-parental-rights proceedings de novo, which means examining both the facts and law and adjudicating anew those issues properly preserved and presented. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). We are not bound by the juvenile court's factual findings, but we give them weight, especially when witness credibility is critical to the outcome. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Proof must be clear and convincing, which means we see no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

[2] The custody of J.E. is not a subject of this appeal.

"slightly slapped [J.E.'s] hand and said 'bad girl' while [J.E. was] drinking her bottle." The DHS exhibit in support of C.E.'s removal also included the following quotations from a psychological evaluation of Ashley completed by Dr. Rosanna Jones-Thurman on September 14, 2015:

> [T]he examiner believes that [Ashley] will continue to show obviously the low cognitive functioning, which will not change over time, but a minimization of responsibility and accountability, as well as not acknowledging some of the issues and problems as they are. Certainly there appear to be difficulties with understanding correct parenting and Ashley really shows no emotion here today.
> Certainly there appear to be some significant mental health issues and problems here that will not go away with any amount of counseling or education. At this point in time, the examiner would not recommend that [Ashley] have her child back even with family supervision as it appears that there are too many negative and hostile dynamics within the family as well.

At the hearing on C.E.'s removal in early August 2016, Ashley's attorney complained the State "cherry picked" language from Dr. Jones-Thurman's report favorable to its position. In its temporary-removal order, the court approved a second psychological evaluation for Ashley "to determine if there has been any progress made." C.E. was placed with a foster family.

In September 2016, Ashley had three two-hour supervised visits with C.E. each week. The Boys Town FSRP (family safety, risk and permanency) worker allowed Ashley's mother and sister to attend the interactions. According to the FSRP reports, Ashley struggled with calming C.E. when he was fussy and passed him to her mother when he cried. On September 22, 2016, the juvenile court adjudicated C.E. as a child in need of assistance (CINA) under Iowa Code section 232.2(6)(c)(2) (2016).

In late September 2016, Ashley underwent a second psychological evaluation—this time with Dr. Jamie Ryder. While noting possible underreporting of negative information by Ashley, Dr. Ryder developed an overall impression that Ashley met the criteria for an unspecified adjustment disorder—due to "stressful situations related to DHS involvement with her children and not having either of her children in her custody at this time." In closing, the psychologist asserted: "At this time, there is no information present to me through the course of this evaluation or otherwise that would suggest she is not capable of successfully parenting her children."

In October 2016, Ashley cancelled six of twelve scheduled visits with C.E. In its dispositional order in late October, the juvenile court determined Ashley had not offered any legitimate reasons for cancelling visits, and the court suspected she may have been focusing more on her boyfriend than her son. The court also noted the contradictory findings from Dr. Jones-Thurman and Dr. Ryder, musing: "It is almost as if two different people were the subject of the psychological evaluations." The court decided "it would be helpful to have an updated psychological evaluation" from Dr. Jones-Thurman because Ashley's "circumstances have changed" since her original evaluation.

Ashley underwent her third psychological evaluation on January 17, 2017. Dr. Jones-Thurman initially reviewed her September 2015 findings when she diagnosed Ashley with "ADHS, Unspecified Depressive Disorder, and Mild Intellectual Disability." In Dr. Jones-Thurman's second evaluation, Ashley scored in the average to below-average range on IQ tests. Dr. Jones-Thurman's second report found Ashley to be more emotionally stable, "despite her cognitive

limitations." Dr. Jones-Thurman still was not sure Ashley could parent her child without any help, but encouraged the DHS to give Ashley the opportunity to try "to help raise her son."

The juvenile court held a permanency hearing in early March 2017. In its order, the court discounted the value of the psychologists' reports: "Frankly, from the [c]ourt's perspective, the three evaluations submitted are not that useful to the [c]ourt's determination as to what the permanency goal should be. Each report is vastly different from the prior report making it difficult to find any of them are dispositive on this topic." The court instead focused on the inconsistency in Ashley's visits with C.E., noting she had missed more than half of the scheduled visits in the most recent reporting period. The court also expressed concern about disruptive behaviors repeatedly exhibited by members of Ashley's family, to the extent that the police had been called to intervene. Finally, the court recounted Ashley's continued difficulty in retaining "education provided to her regarding parenting skills" and inability to follow through with suggestions provided to ensure C.E.'s safety. The court set a permanency goal of adoption.

On April 10, 2017, the State filed its petition to terminate parental rights. In a May 17 report to the court, the DHS worker wrote: "Ashley needs to have an updated assessment of her apraxia diagnosis and to what extent this may or may not interfere with her ability to parent or limitations she may experience in attempting to learn child-rearing related skills." At the May 25 termination hearing, Ashley's attorney established that the DHS worker misunderstood apraxia to be a cognitive diagnosis rather than a motor-skill disorder.

The juvenile court issued its termination decision on June 9. The court based its termination of Ashley's parental rights on Iowa Code section 232.116(1)(e) and (h).[3] Ashley now appeals.

## II. Analysis of Mother's Arguments

### A. Clear and Convincing Evidence of Inability to Reunite

Ashley claims the State offered insufficient evidence to satisfy the statutory grounds for terminating her relationship with C.E. Where the juvenile court has terminated a parent's rights on more than one ground, we need only find termination proper under one section to affirm. *In re J.B.L.*, 844 N.W.2d 703, 704 (Iowa Ct. App. 2014). In this case, we find the juvenile court properly terminated Ashley's parental rights under section 232.116(1)(h). This section provides for termination if the State proves the following elements by clear and convincing evidence:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code § 232.116(1)(h).

Ashley challenges only the fourth element, asserting C.E. can be returned to her care because she has maintained a suitable home and employment and has complied with court-ordered services. She contends the weight given to the

---

[3] Although C.E.'s paternity had not been established, the court also terminated the rights of any putative father.

September 2015 evaluation—compounded by the mistaken view of the DHS workers that her apraxia was a cognitive disability—prevented her from moving to unsupervised visitation with C.E.

We find the evidence in the record satisfied the fourth element of subsection (h). According to the May 2017 DHS report to the court, Ashley was "dependent on her parents for financial management, financial support, and transportation." Ashley moved several times during the CINA case; she was unemployed and living with her parents at the time of the termination hearing. The DHS worker testified she had safety concerns about that household. Ashley never progressed beyond fully supervised visitation because the FSRP workers lacked confidence in her ability to attend to C.E.'s needs and ensure his safety. Given these circumstances, termination under section 232.116(1)(h) was appropriate. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (affirming termination where record indicated "after a year of services, the parents were still not in a position to care" for child). We reject Ashley's assertion that her first psychological evaluation or misconceptions about apraxia impacted the ultimate decision to terminate her parental rights.

## B. Reasonable Efforts

Once again pointing to Dr. Jones-Thurman's original views and the DHS worker's misunderstanding of apraxia, Ashley argues the DHS "never gave her the benefit of the doubt" when offering reunification services. The DHS is required to make every reasonable effort to return a child to his home—consistent with the child's best interests. Iowa Code § 232.102(7); *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). If a parent does not request additional

services at an appropriate time, we may find the parent has waived the argument that DHS did not make reasonable efforts. *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002). Assuming without deciding Ashley's reasonable-efforts argument was preserved, we find the DHS met its requirement to offer reasonable reunification services.

The DHS worker's misunderstanding of Ashley's apraxia diagnosis did not impact the services provided. The FSRP reports offered as exhibits identify as "needs" that Ashley had been diagnosed with both apraxia *and* intellectual disability. The reports emphasized: "It will be important for Ashley to continue working with professionals to accurately understand [C.E.'s] developmental stages and potential safety concerns that accompany each stage."

At the termination hearing, the DHS social worker clarified it was not Ashley's speech impediment that caused concern:

> The issue here is not lack of communication or lack of understanding what Ashley is saying. Ashley can't do it. She is not able to demonstrate independently how to meet her child's basic needs through her actions and her activity with her child, when you observe it, when you sit beside her and observe it, she is not able to do it without a lot of redirection and coaching.

Similarly, the record does not support Ashley's allegation that Dr. Jones-Thurman's September 2015 opinion dampened the DHS drive to offer services that would led to reunification with C.E. The DHS was aware of all three evaluations and acted accordingly. The DHS May 2017 report to the court discussed the psychologist's more positive January 2017 view: "Dr. [Jones-] Thurman also recommended that Ashley be given more opportunities to parent her child. Despite the Department's efforts to increase interactions, due to

Ashley's lack of participation in consistent interactions with [C.E.], the Department has been unable to increase." The record affirms Ashley did not take full advantage of the services offered. She was inconsistent in attending visitations and failed to maximize contact with her son. We are unconvinced by her reasonable-efforts argument.

## C. Best Interests

Ashley next argues termination is not in C.E.'s best interests because "it would deprive the child of the opportunity to be raised by [his biological] mother." Of course, that generic assertion is at play in every termination-of-parental-rights case. Our best-interests analysis must track Iowa Code section 232.116(2). *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (rejecting court's use of an unstructured best-interests test). That provision focuses our attention on the child's safety; the best placement for furthering his long-term nurturing and growth; and his physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2). According to the record, C.E. has been receiving quality care in his foster home and would be a good candidate for adoption. Here, the guardian ad litem supported termination, emphasizing Ashley had trouble retaining the parenting skills she had been taught and could not offer a safe environment for her young son.

By the time of the termination hearing, C.E. had been in foster care for eleven months, virtually since he was born. We conclude the child's safety and his physical and emotional needs will be best served by terminating Ashley's parental rights and allowing C.E. to move toward a permanent home.

**AFFIRMED.**