# IN THE COURT OF APPEALS OF IOWA

No. 18-0618
Filed June 20, 2018

**IN THE INTEREST OF T.B. and B.B.,**
**Minor Children,**

**J.W., Mother,**
     Appellant,

**C.B., Father,**
     Appellant.

_____

Appeal from the Iowa District Court for O'Brien County, David C. Larson, District Associate Judge.

A mother and father each appeal from termination of their parental rights to two children. **AFFIRMED ON BOTH APPEALS.**

Christopher D. Sandy of Sandy Law Firm, Spirit Lake, for appellant mother.

Tobias Cosgrove, Sibley, for appellant father.

Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

Tisha M. Halverson of Klay, Veldhuizen, Bindner, DeJong & Halverson PLC, Paullina, guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**TABOR, Judge.**

Charles and Joni[1] appeal from termination of their parental rights to two children, five-year-old B.B. and two-year-old T.B. The parents contend the State failed to offer clear and convincing evidence to support the grounds for termination under Iowa Code section 232.116(1)(f) and (h) (2017). The parents also argue termination of their rights will be detrimental to the children due to the closeness of their relationship and they should have been given an additional six months to work toward reunification.

We have reviewed the record and now determine, although the parents addressed the initial concerns of homelessness and instability, continued removal of the children is necessary because of shortcomings in their parenting skills and judgment. After two years out of their parents' care, including an extension of six months, the best interests of the children will be served by termination of parental rights. We affirm the order of the juvenile court.

**I.      Facts and Prior Proceedings**

The family first came to the attention of the Iowa Department of Human Services (DHS) in December 2015, when T.B. was six months old. Charles was carrying the child and dropped him, breaking one of his legs. An investigation concluded the harm was accidental. In May 2016, DHS discovered the family was homeless, and the parents agreed to a voluntary foster care arrangement until they could obtain stable housing and jobs.

---

[1] These parents are not married but have lived together throughout these proceedings.

The juvenile court adjudicated the children in need of assistance (CINA) in August 2016 and placed them with a foster family. *See* Iowa Code § 232.2(6)(g) (failure to exercise a minimal degree of care in supplying the child with adequate food, clothing, or shelter). To achieve reunification, the court expected the parents to obtain secure housing and jobs, and to participate in services—including budgeting and parenting instruction. The DHS also provided mental health services for the parents; family safety, risk, and permanency services; visitation; parent-child interactive therapy (PCIT) services; individual therapy; psychiatric evaluations; and transportation assistance. Following review hearings in October and December 2016, the court determined the children still could not be returned to the parents.

In April 2017, after the children had been out of the parents' care for one year, the court held a permanency hearing and concluded, "[I]t is reasonable to believe that the need for continued removal will no longer exist at the end of an additional three months." Then, in July 2017, the court gave the parents another three months to work toward reunification. But by October, the court had determined the children still could not be returned, and the State filed a petition to terminate parental rights. After a series of hearings in December 2017 and January 2018, the court entered its order terminating parental rights in April 2018.

The parents' initial financial situation improved with significant services including budgeting assistance. Toward the end of the CINA case, the father worked full time and the mother worked part time. By that time, they achieved some economic stability, with the help of their parents and siblings, a food pantry, and an understanding landlord who worked with them when they were late paying

rent. Thus, the parents made progress toward addressing the homelessness and lack of resources that led to the original voluntary removal.[2]

But, during the CINA case, new issues arose that posed a danger to the children, specifically the parents' gaps in caretaking skills and poor judgment. The DHS caseworker was concerned when the parents lived with and exposed the children to Charles' coworker, who was a registered sex offender.[3] Although the DHS made its concerns known to the parents at the time, they continued to associate with people who had not been approved to be around the children, particularly during unsupervised visits.

As DHS followed the family and its interactions, social workers noted the parents easily became overwhelmed by the disciplinary needs of their young children. During the two years the children were out of their care, Joni and Charles received numerous services to improve their parenting, including PCIT. But social workers routinely noted the parents were unable to apply the skills they were being taught to their family interactions. Social workers testified they frequently had to intervene or prompt the parents to engage in caregiving, and the parents did not have age-appropriate expectations for the children's abilities. When he became agitated during an encounter, Charles would speak unduly harshly to the boys and was physically aggressive toward them. For example, on one occasion, Charles

---

[2] Still, the social worker assisting with budgeting testified she was unable to account for between $1000 and $1200 of their earnings each month. Charles continued to drive on a suspended license, including driving with the children in the car during their unsupervised visitations. Eventually, he was arrested for driving with a suspended license. Rather than serve the ninety days in jail, he opted to have in-home monitoring, which cost the family $600 per month.

[3] Charles is himself a registered sex offender, stemming from a conviction more than twenty years ago.

grew frustrated B.B. was not listening and forcefully pushed B.B.'s legs into a car seat.  Charles would often forcefully grab things from the children's hands.

A social worker testified the boys were energetic and loved to climb and run around.  But the parents would not intervene to ensure their safety (for example, when the boys were climbing on top of a picnic table) until prompted by the social worker.  When the children did not mind their warnings, the parents did not persist, and the social worker had to step in to ensure the children's safety.  One social worker testified she carried out most of the parenting responsibilities during visits.  Another social worker testified the parents had improved a little closer to the termination hearing but "once we left PCIT, all of those skills kind of went out the door."  The parents struggled to implement tools like instilling praise, redirecting problematic behaviors, and providing activities to keep the children busy during visitations without becoming frustrated and resorting to harsh language and aggressive contact.

The DHS ended the parents' overnight visitations out of concern for the children's safety.  During one weekend visit, Charles was caring for the children alone while Joni was at work.  Overwhelmed by the responsibility, Charles called the foster parents to come get the children early.  Later that day, B.B. told his foster mother Charles had hit him in the face with a sock as a punishment.  DHS ended unsupervised visits at that time.  Later, visits returned to semi-supervised, but an incident involving Charles becoming physically aggressive toward the children and then angry at the social worker who pointed it out led DHS to resume fully supervised visits.  According to the social workers, the longer the visits lasted, the more weighed down the parents appeared.  For most of the six months before the

termination petition, visitation lasted two hours two days per week. The parents twice asked for additional visitation time, in January and July 2017, but these requests were denied.

Joni's mother testified she did not believe Joni and Charles could be full-time parents. In her view, classes had not yet worked to improve their parenting. She believed parental rights should be terminated and the children adopted. The grandmother testified she did not think the parents were able to provide for the children—even basic needs like food—because they had a difficult time caring for themselves and participating in services. Both Joni and Charles have some cognitive deficiencies and mental-health disorders that affect their ability to parent. Both parents have attended some individual therapy. Joni has been prescribed medication for bipolar disorder, and Charles has been prescribed medication for anxiety. At the termination hearing, the therapist testified Charles's anxiety had improved. Following psychological evaluations, the therapist recommended they continue with individual therapy and medication management.

The PCIT provider informed the court in a letter the parents had completed one of two steps of the PCIT program. She could not predict how long it would take the parents to finish the second step of the program.

In the summer of 2017, the children were transferred to a new foster home,[4] but B.B. acted out by scratching himself, banging his head on a wall, and destroying things in the new home. When returned to the prior foster home, he quickly reintegrated into the family and his problematic behaviors stopped. The

---

[4] This was due to some medical concerns of the first foster mother.

children view their foster parents as their source of safety; they cling to the foster parents and had to be encouraged to greet Joni and Charles. A social worker testified the children are safe and adjusting well to their foster homes. Neither foster family is able to adopt the brothers together.[5] But they are committed to maintaining contact between the siblings and with the maternal grandparents. The social worker who worked with the family leading up to the termination hearings noted, although Joni and Charles love the children, they do not have the necessary abilities, foresight, or insight when it comes to parenting. She testified, in contrast, the foster parents impose appropriate discipline and structure and the children are better behaved with them.

Ultimately, the juvenile court determined Joni and Charles "lack the necessary parenting skills to exercise a reasonable degree of care in supervising" the children, and the children could not be returned to their care at the time of the termination hearing. Joni and Charles appeal. The State and the children's guardian ad litem both defend the order terminating parental rights.

## II.    Analysis

### A.  Return to Parental Custody

The court terminated parental rights under Iowa Code section 232.116(1)(f) with respect to B.B. and under section 232.116(1)(h) with respect to T.B., based on their respective ages.[6] Both paragraphs (f) and (h) require clear and convincing

---

[5] At the close of the hearings, B.B.'s foster family had not yet decided if they were able to adopt. T.B.'s foster family expressed willingness to adopt.

[6] We review termination-of-parental-rights proceedings de novo, which means examining both the facts and law and adjudicating anew those issues properly preserved and presented. *In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). We are not bound by the juvenile court's factual findings, but we give them weight, especially when witness credibility is critical to the outcome. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

evidence the children cannot be returned to the custody of their parents due to a risk of further harm. *See* Iowa Code § 232.102; *see also id.* § 232.116(1)(f)(4), (h)(4). The parents contest only this common element of paragraphs (f) and (h).

Joni and Charles contend the State failed to offer clear and convincing evidence the children could not be returned to their care. They emphasize their progress in finding jobs and a stable home; they completed step one of PCIT and were moving onto step two. The parents also seek to minimize Charles's aggressive behavior toward the boys by asserting his hearing impairment requires him to speak louder. The parents also point out the DHS did not reach a founded child abuse assessment in this case.[7] But a founded child abuse assessment is not a necessary element under section 232.116(1)(f) or (h). Joni and Charles deserve credit for their efforts to obtain jobs and a stable home, but the record reveals they have not adequately addressed their parenting deficiencies.

At each turn, social workers testified the parents cannot safely supervise the boys without continuous intervention. The parents are unable to apply skills they have learned in PCIT to even short supervised interactions. The parents' anger and frustration continued to get the better of them, even when visits were only twice a week for two hours. The parents' inability to handle these active children led the DHS to cancel overnight and unsupervised visitations. Even Joni's mother acknowledged Joni and Charles lacked the wherewithal to provide for the

---

The State must offer clear and convincing proof, which means we see no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000)).

[7] B.B.'s allegation that Charles hit him with a sock was investigated but unfounded and left with the social workers to address.

children's most basic needs. The grandmother saw no parenting improvement despite the PCIT lessons.

Joni and Charles both have intellectual challenges and ongoing mental-health issues that impact their ability to assume the responsibility of full-time parenting. We recognize "lower mental functioning alone is not sufficient grounds for termination." *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (citing *D.W.*, 791 N.W.2d at 708). Nor can termination be based solely on economic factors. *Id.* In this case, as in *A.M.*, "the parents' overall decision making, not their level of resources, was the fundamental problem." *Id.* Joni and Charles have not been able to "internalize the necessary skills to keep [the children] safe and developing properly without the hovering supervision of DHS workers." *Id.* at 111-12. The children have been placed outside the home continuously since May 2016. Joni and Charles still lack the skills to exercise a reasonable degree of care in supervising an active toddler and preschooler. They have made some progress in their PCIT lessons but demonstrate minimal application of those lessons in real-world situations. We find clear and convincing evidence in the record the children could not be safely returned to the parents' care at the time of the hearings.

## B. Closeness of Parental Relationship

The parents further argue the court should have found "termination would be detrimental to the child[ren] at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). The parents contend they have a close bond with the children and the brothers have a close bond with each other, which would be disrupted as the foster families are unable to adopt the siblings together. The juvenile court agreed the parents were bonded with the children but not so

strongly that termination would be detrimental to B.B. and T.B. The factors under Iowa Code section 232.116(3) are permissive and within the sound discretion of the juvenile court. *In re P.L.*, 778 N.W.2d 33, 39-40 (Iowa 2010).

The children have been out of the parents' care for nearly two years. A social worker testified a bond still existed between the children and their biological parents but both children call their foster parents "mom" and "dad." The children have a sense of safety and belonging with their foster families. We cannot conclude termination of parental rights would be detrimental to the children, especially since B.B. has spent almost half his life and T.B. almost his entire life out of their care.

Section 232.116(3)(c) applies to the parent-child relationship, not the relationship between siblings. But the sibling bond and the prospect that the boys will be adopted separately is a relevant factor in considering their best interests. Wherever possible, siblings should be kept together. *See In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982). Here, the foster parents have expressed a commitment to maintaining contact between the children, even if they cannot be adopted together. And the paramount concern is the best interests of the children. *Id.* at 201. In this case, their best interests are met by terminating parental rights.

### C. Additional Six Months

Finally, the parents ask for six more months to work toward reunification. They point to their success in securing housing and employment, and they assert their therapists were optimistic about their progress.

The juvenile court may enter an order extending permanency if it determines "the need for removal of the child from the child's home will no longer

exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). By the time of termination, the children had been out of the home for nearly two years with no trial periods at home and progressively more restrictive visitation due to the parents' actions. The court delayed a permanency hearing twice, giving the parents an additional three months to work toward reunification in April 2017 and another three months in July 2017. But after those six months, the court found insufficient progress to return the children home. The therapist praised their completion of step one of the two-step PCIT program, but it is not clear that, at the end of six months, they will have finished the second step. Even if they finished, their inability to apply the skills from step one bodes poorly for lasting change.

"A parent does not have an unlimited amount of time in which to correct his or her deficiencies." *In re H.L.B.R.*, 567 N.W.2d 675, 677 (Iowa Ct. App. 1997). Once statutory timelines have run, the best interests of the child are promoted by termination. *In re L.M.F.*, 490 N.W.2d 66, 68 (Iowa 1992). Young children cannot wait indefinitely for stable parents. *D.W.*, 791 N.W.2d at 707. Joni and Charles had two years to overcome their parenting deficiencies. They have not been able to do so. Delaying permanency is not appropriate under these circumstances.

**AFFIRMED ON BOTH APPEALS.**