# IN THE COURT OF APPEALS OF IOWA

No. 20-0678
Filed October 21, 2020

**IN THE INTEREST OF E.H.,**
**Minor Child,**

**D.H., Father,**
    Appellant,

**M.W., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

The mother and father separately appeal the termination of their parental rights to their child.  **AFFIRMED ON BOTH APPEALS.**

Shane P. O'Toole, Des Moines, for appellant father.

Jeremy L. Merrill of Lubinus & Merrill, P.L.C., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Erin Romar of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., Greer, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**POTTERFIELD, Senior Judge.**

The mother and father separately appeal the termination of their parental rights to E.H., who was born in 2016. The court terminated each parent's rights pursuant to Iowa Code section 232.116(1)(h) (2019). On appeal, the mother and the father each maintain the State failed to prove the statutory ground for termination, the loss of their rights is not in E.H.'s best interests, and their respective parent-child relationship should be saved due to the closeness of their bond with the child. Alternatively, each parent maintains they should be given more time to work toward reunification with E.H.

Our review of termination proceedings is de novo. *In re D.G.*, 704 N.W.2d 454, 457 (Iowa Ct. App. 2005). And our primary concern is the best interests of the child at issue. *Id.* "[I]n termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally." *Id.* at 459. For that reason, we consider each parent's appeal separately.

**I. Mother's Appeal.**

**A. Statutory Ground.** The juvenile court terminated the mother's parental rights under section 232.116(1)(h), which allows the court to sever the parent-child relationship when all of the following are proved:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The mother challenges only the fourth element—whether E.H. could be returned to her care at the time of December 2019 termination hearing. *See In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (interpreting "at the present time" to mean "at the time of the termination hearing").

At his birth in 2016, E.H.'s umbilical cord tested positive for methadone, which the mother had never been prescribed. This caused the Iowa Department of Human Services (DHS) to become involved with the family, but E.H. remained in the mother's care and DHS closed the eligible-services case several months later. Then in October 2018, the mother gave birth to another child, I.W. I.W.'s umbilical cord tested positive for methamphetamine, amphetamines, and hydromorphone. The mother left the hospital against medical advice only a few hours after I.W.'s birth. She voluntarily signed away her parental rights to I.W. a short time later, and I.W. is not at issue here.

Because of the positive drug test at I.W.'s birth and because the mother was E.H.'s primary caregiver, DHS reengaged with the family immediately following I.W.'s birth. The mother refused to agree to a safety plan, and E.H. was formally removed from her care on October 11, 2018. At a physical following his removal, E.H. tested positive for amphetamines and methamphetamine in a hair-stat test.

Throughout the duration of the case, between October 2018 and December 2019, the mother never completed a substance-abuse evaluation that she allowed DHS to see[1] and never engaged in drug testing. During the same time period, she

---

[1] It is unclear to us whether the mother actually completed an evaluation but refused to sign the necessary releases so DHS could access the information or if

struggled to regulate her emotions. The police had to be called to at least two of her supervised visits because the mother was "out of control."[2] The mother sent threatening messages to her brother and his wife, who were caring for E.H. at the time of the termination hearing.[3] She also sent strange messages to the social worker, demanding evidence E.H. was alive and had not been kidnapped. The mother told the worker she would be filing a missing person's report for E.H. During the termination hearing, the court had to instruct the mother to calm down and answer the questions that were asked of her several times. Additionally, during her testimony, the mother was asked if she had threatened to kill the social worker or blow up the building. She denied doing so. When then confronted with an audio recording of the mother saying as much on a telephone call to a man in jail,[4] the mother went to the bathroom and refused to leave it for nearly an hour— even when the court initially ordered her out.[5]

---

she just never completed an evaluation. The mother's testimony at the termination hearing showed she was also confused whether she had a substance-abuse evaluation.

[2] The police were involved other times as well. Once the maternal grandmother called the police "as a precaution" after the mother threatened to come take E.H. Another time, the police were called when the grandmother was supervising a visit for both parents after the parents began fighting.

[3] The mother's messages included statements that they "wouldn't be happy about what happens," and she was going "to show up at [their] house." She also said, "I will snap out on you personally I will come over there and we will have a very private conversation and you won't like it."

[4] During the phone call, the mother said, "I'm gonna kill this bitch. I'm gonna put her in a river" and then said she was referring to "this bitch who's taking my kid." She also reports to the man on the other end of the line, "I threatened the county attorney. I threatened to kill him. I threatened to blow up the building." During the same call, the mother also spoke about taking her own life.

[5] The court found the mother in contempt, and she was sentenced to thirty days in jail.

On appeal, the mother argues there is little evidence she had an issue with substance abuse. She argues that she could resume caring for E.H. and points to the fact that she attended therapy consistently from January 2019 to December and was able to exhibit insight into her previous reactions and behaviors during her testimony at the termination hearing.

We disagree with the mother's characterization of the evidence regarding substance abuse. The only two drug tests involving the mother—the test of E.H.'s and I.W.'s umbilical cords—were positive for methadone and amphetamines, methamphetamine, and hydromorphone, respectively. She was advised that missing a drug test was considered a positive result; she missed all seven she was asked to complete.[6] And at the termination hearing, while admittedly vague, the mother testified as to her "dual diagnosis" and her therapist's advice she should engage in "more treatment, more intensive outpatient or inpatient treatment possibly, and it addresses any drug use that goes along with mental health illness."

It is unclear if the mother's issues regulating her emotions and controlling her behavior stems from drug abuse, mental-health issues, or a combination of the two. But, whatever the cause, she was unable to safely care for E.H. at the time of the termination hearing due to these issues.

**B. Best Interests.** Next, the mother makes a general statement that termination of her rights is not in E.H.'s best interests "because of the bond between the parent and child." While the mother and E.H. share a bond, our best-interests analysis focuses on E.H.'s long-term and immediate interests, including

---

[6] The mother went to the testing location for one of the requested tests, but she failed to provide a sample.

his "safety," "the best placement for furthering the long-term nurturing and growth," and his "physical, mental, and emotional condition and needs." *See* Iowa Code § 232.116(2); *In re C.W.*, 554 N.W.2d 279, 283 (Iowa Ct. App. 1996). The mother is not in a position to provide E.H. a safe, stable home with consistent parenting. Termination of her rights is in E.H.'s best interests.

**C. Permissive Factor.** The mother maintains the juvenile court should have applied the permissive factor in section 232.116(3)(c) to save the parent-child relationship. The court can forego termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). The juvenile court found this section inapplicable, ruling the mother's "bond with [E.H.] has been impacted by her inappropriate, violent, threatening behavior. Also, the mother missed visits with [E.H.] due to her refusal to meet with DHS and [service providers] to discuss visitation expectations." The mother generally attended visits with E.H.—up to four times per week before the maternal grandmother was no longer allowed to supervise interactions—and her interactions with him directly went well. But we agree with the juvenile court that, after considering "the unique circumstances of [this] case and the best interests of" E.H., this is not a case that warrants the application of a permissive factor. *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

**D. Additional Time.** In the alternative, the mother maintains the juvenile court should have delayed permanency and given her six more months to work toward reunification. *See* Iowa Code § 232.104(2)(b). The juvenile court can only delay permanency if it finds the child will be able to return to their parent's care at

the end of the extension. *See id.* We agree that was not possible in this case. E.H. had been out of the mother's care for approximately fourteen months at the time of the termination hearing; the mother still denied taking the illegal drugs that showed up in umbilical cord tests for both E.H. and his sibling. She testified about needing more intensive treatment for her "dual diagnosis" and "any drug use" but refused to complete a substance-abuse evaluation or drug tests and generally denied using illegal substances.[7] The mother seemed to be making progress in therapy. She was able to explain the insight she now has into her behaviors and reactions. But her actions in the courtroom during the hearing and the threats she made beforehand showed that she was not yet able to control those behaviors. And her therapist estimated the mother's "discharge date" to still be a year away.

We affirm the termination of the mother's parental rights to E.H.

**II. Father's Appeal.**

**A. Statutory Ground.** The father's parental rights were also terminated under section 232.116(1)(h), and the father purports to challenge the final element, which requires a finding the child cannot be returned to the parent's care at the time of the termination hearing. *See A.S.*, 906 N.W.2d at 473. But the father was in prison at the time of the termination hearing, and his argument on appeal is that he could begin caring for E.H. within six months. However it is couched, this argument is not a challenge to section 232.116(1)(h). The statutory grounds for termination were met.

---

[7] The mother testified she is a recovering alcoholic and said she last used illegal drugs when she took some anxiety medication that was not prescribed to her during her pregnancy with E.H.—before DHS involvement with the family.

**B. Best Interests.**   Next, the father claims termination of his rights is not in E.H.'s best interests.   Like the mother, he makes this argument focusing on the bond he shares with E.H.   The father points out that while in prison—since August 2019—he called and spoke to E.H. for five to ten minutes every one to two days. We commend the father for taking it upon himself to maintain contact with E.H. during the father's incarceration.   But this contact does not provide E.H. with safety or a permanent, stable home, which is what we must consider when applying the best-interests analysis.   *See In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019) ("In determining best interests, 'we look to the child's long-range as well as immediate interests,' 'consider[] what the future holds for the child if returned to the parents,' and weigh 'the child's safety and need for a permanent home.'" (citation omitted)). Termination of the father's rights is in E.H.'s best interests.

**C. Permissive Factor.**   The father argues generally that terminating his rights is "far more detrimental to his child" and says the court erred in its determination "that exceptions did not apply."   We presume the father is claiming section 232.116(3)(c) should be applied to save the parent-child relationship.   But the parent has the burden to prove a permissive factor should be applied, *see A.S.*, 906 N.W.2d at 476, and the father did not meet this burden in the juvenile court.

**D. Additional Time.**   In the alternative, the father maintains the juvenile court should have delayed permanency and given him six more months to work toward reunification.   As we noted before, in order for the court to do this, it must be able to find the child will be able to return to the parent at the end of the extension.   *See* Iowa Code § 232.104(2)(b).   Here, the father was in prison serving out a sentence for third-degree burglary, which the court reinstated after the father

admitted to violating the terms of his probation by using methamphetamine. At the December 2019 termination hearing, the father participated by phone and testified he would be eligible for parole in April 2020. The father acknowledged that parole was not guaranteed, and his tentative discharge date is not until August 2021. The father spoke about the changes he intends to make in his life and his desire to stay away from drugs and criminal activities. We hope he does so. But, even if he were to receive the April parole, six months from December 2019 was not long enough for the father to establish that he could maintain his sober lifestyle outside of an institution and take over being E.H.'s full-time caregiver.

We affirm the termination of the father's parental rights to E.H.

**AFFIRMED ON BOTH APPEALS.**