**IN THE COURT OF APPEALS OF IOWA**

No. 24-0032
Filed April 10, 2024

**IN THE INTEREST OF Z.T.,**
**Minor Child,**

**K.T., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, David F. Staudt, Judge.

A mother appeals the termination of her parental rights to her child. **AFFIRMED.**

Tammy L. Banning of Waterloo Juvenile Public Defender, Waterloo, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Nina M. Forcier of Forcier Law Office P.L.L.C., Waterloo, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

A mother appeals the termination of her parental rights to her child, Z.T., born in 2021. She asks us to decline to terminate based on a permissive exception and argues a guardianship should be established. Upon our review, we affirm the termination.

## I.    *Background Facts and Proceedings.*

The Iowa Department of Health and Human Services (HHS) became involved with the family in December 2022 based on allegations of neglect, domestic violence, and that the mother was supervising children while under the influence of methamphetamine. Living in the home were the mother, Z.T., and his older half-sister,[1] and HHS described the home as "full of garbage, choking hazards and unsanitary conditions."

The mother also had a tumultuous relationship with her then-paramour, who entered the home without permission and assaulted the mother. He "grabbed [the mother] by the throat, struck her in the chest, and pushed her against the wall" in the presence of the children.

HHS was further concerned about the mother's substantial history of substance-use issues. In the year and a half leading up to the time that HHS became involved with the family, the mother admitted that she was using methamphetamine "all day every day." One month before HHS became involved,

---

[1] Z.T.'s half-sibling was originally adjudicated alongside Z.T., but since being placed with her father, she was no longer a subject of these proceedings. We therefore do not consider her as part of our analysis.

she was using marijuana daily and had reduced her methamphetamine use to every other day.

In January 2023, just weeks after HHS first engaged with the family, the mother reported that she heard a scream while in the shower. When she came out to see what was wrong, she discovered Z.T. with severe burns from his chin to waist, and he was struggling to breathe. The mother immediately called an ambulance, who rushed Z.T. to the hospital. The burns were the result of contact with and ingestion of a powerful chemical drain cleaner. The local hospital intubated Z.T. and life-flighted him to Iowa City. During this crisis, the mother was "uncooperative with dispatch, officers, and hospital staff."

Meanwhile, law enforcement returned to the family home, where officers discovered "two baggies of what appeared to be meth residue." When questioned by HHS about the mother's history of substance use, the maternal grandmother expressed concern for the children's safety. She stated that "she observed two bruises on [Z.T.'s] arm on Christmas Day," which the mother attributed to his half-sister. The maternal grandmother also disagreed with the mother's suggestion that Z.T.'s half-sister had poured the chemical drain cleaner on him. Instead, the grandmother implied the mother was responsible for the injuries because her story didn't make sense, asking "why didn't [Z.T.'s half-sister] get burned as well?"

During the first few days of Z.T.'s recovery, he was described as being "in very dire condition." But the mother left the hospital after HHS asked her to submit to drug testing, and she did not respond to the Department's attempts to reach her. When Z.T. was in need of skin-graft surgery, the hospital similarly struggled to

contact the mother to obtain consent for the procedure. In order for Z.T. to receive medical care, the juvenile court removed Z.T. from his mother's care and custody so HHS could provide the necessary consent.

After the mother did not appear for a meeting with her pretrial release officer, a warrant was issued for her arrest. When authorities apprehended her, she was charged with possession of methamphetamine, child endangerment, and neglect or abandonment of dependent person related to Z.T.'s injuries. Based on the charges, a no contact order was put in place with Z.T. as the protected party.

In the meantime, Z.T. remained in the pediatric intensive care unit. Medical personnel continued to try to stabilize Z.T., and he underwent another surgery nearly two weeks after the injury. When Z.T. was finally stabilized, he was transferred to a burn recovery unit for further rehabilitation. After five weeks in the hospital, Z.T. was released on February 13 and placed with his paternal aunt. Z.T.'s aunt and her fiancé had to be specially trained to care for Z.T. because he was still "100% dependent on his feeding tube for nutrition" and his wounds required special cleaning. Over the life of the case, Z.T. required multiple surgeries and procedures, including a skin graft and "three procedures to open up his esophagus so that he can eat." The HHS worker testified that Z.T. will continue to have multiple laser surgeries to help with scarring and attend a multitude of medical appointments.

In March 2023, Z.T. was adjudicated as a Child In Need of Assistance. By May, the mother was convicted of child endangerment and possession of methamphetamine, and the no contact order was extended another five years.

Soon after the mother's transfer to prison, the State petitioned for termination of her parental rights to Z.T.

In the months before termination, HHS was unable to coordinate visits between the mother and Z.T. due to the no contact order. But the mother testified that, while in prison, she was able to benefit from the substance-use and mental-health services offered and would continue to over her fifteen-year sentence. While the mother had made progress under these circumstances, the juvenile court ultimately terminated her parental rights to Z.T. under section 232.116(1)(h) (terminating when the child could not be returned to the parent's custody) and (j) (terminating when the parent is incarcerated for a crime against the child).[2] The mother appeals, challenging only the permissive exceptions to termination and the decision not to establish a guardianship.

## II. Review.

Our review of termination-of-parental-rights proceedings is de novo. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). "Although we are not bound by them, we give weight to the [juvenile] court's findings of fact, especially when considering credibility of witnesses." *Id.*

## III. Discussion.

We use a "three-step analysis" in termination-of-parental-rights proceedings, in which we determine whether statutory grounds for termination have been met, if the best interests of the child support termination, and whether we should exercise permissive exceptions to termination. *In re A.B.*,

---

[2] The father's rights were also terminated during these proceedings, but he does not appeal.

957 N.W.2d 280, 294 (Iowa 2021) (citation omitted).  Our "primary interest" in each step is always the best interests of the child.  *C.B*, 611 N.W.2d at 492.  Because the mother fails to address the first two steps,[3] we limit our analysis to the contested issues.  *See In re J.F.*, No. 19-1647, 2020 WL 110404, at *1 (Iowa Ct. App. Jan. 9, 2020) ("But when, as here, the parent's claims only relate to one step in our analysis, we only address that step.").

*A. Permissive Exception to Termination.*

The mother first argues that we should exercise a permissive exception to terminate based on her incarceration.  *See* Iowa Code § 232.116(3)(e) (permitting the court a discretionary exception when "[t]he absence of a parent is due to the parent's admission or commitment to any institution, hospital, or health facility").  She challenges the definition of "institution" and asks us to interpret it to include penal institutions.  But we have previously declined to apply jail and prison sentences under this section.  *See In re T.P.*, No. 22-0543, 2022 WL 4362194, at *3 (Iowa Ct. App. Sept. 21, 2022) ("[T]he term 'institution' in this provision does not include penal institutions."); *In re J.S.*, 470 N.W.2d 48, 51 (Iowa Ct. App. 1991); *In re D.P.*, 465 N.W.2d 313, 315 (Iowa Ct. App. 1990).  We similarly decline to do so now.

Further, "the factors 'are permissive, not mandatory,'" *In re A.S.*, 906 N.W.2d 467, 475 (Iowa 2018), and we decline to exercise an exception here.  The mother has not fully addressed the circumstances that ultimately led to Z.T.'s removal.  Throughout almost the entire proceedings, the mother has been

---

[3] While the mother contends that guardianship is in the best interests of the child, we address this argument separately, not as part of step two of the analysis.

incarcerated. While we commend the mother's strides made while in prison, she has not yet proven she can maintain sobriety and effectively parent once released. We acknowledge her incarceration and the no contact order served as communication barriers during this case, but they did so because of the mother's own actions. *See In re B.H.A.*, 938 N.W.2d 227, 234 (Iowa 2020) (restating that parents cannot use incarceration as an excuse, especially when "the incarceration results from a lifestyle that is chosen in preference to, and at the expense of, a relationship with the child" (citation omitted)). Z.T. suffered extreme danger and life-altering injuries while in the mother's care. He has numerous and complex medical needs that will require extensive treatment. Based on her previous actions, we see no reason to think the mother will change once released and not prioritize her methamphetamine addiction over Z.T.'s wellbeing. *See id.* at 233 (finding the parent's past performance is "indicative of the quality of the future care that parent is capable of providing" (citation omitted)). Because the mother has not proven she is able to meet Z.T.'s needs, we decline to exercise an exception to termination even if one applied.

*B. Guardianship.*

Finally, the mother argues for guardianship as an alternative to termination. We have consistently found that "a guardianship is not a legally preferable alternative to termination." *A.S.*, 906 N.W.2d at 477 (citation omitted). Guardianships can easily be terminated, and guardians may be removed and appointed at any time. *In re C.B.*, No. 21-0814, 2021 WL 4303660, at *4 (Iowa Ct. App. Sept. 22, 2021). When a child needs permanency, "a guardianship is woefully inadequate to achieve the sort of stable, nurturing and permanent home

[the child] both needs and deserves." *A.S.*, 906 N.W.2d at 478.  Since his removal, Z.T. has achieved a semblance of stability and bonded with his foster family.  *See In re Z.P.*, 948 N.W.2d 518, 525 (Iowa 2020) (finding the child's integration into the foster family in favor of termination); *see also* Iowa Code § 232.116(2)(b).  HHS described Z.T. as being "insanely bonded" with his foster mother, testifying that "[h]e calls her mom.  He is really glued to her hip."  One of the "defining elements" when considering the child's best interests in the "need for a permanent home."  *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (citation omitted).  We cannot deprive Z.T. of that permanency "by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child."  *Id.* at 112.  Instead, we find that termination, not guardianship, is in Z.T.'s best interests and likewise affirm.

## IV.    Disposition.

Because we find no permissive exception should be applied to prevent termination and guardianship is not in the best interests of the child, we affirm termination of the mother's parental rights.

**AFFIRMED.**