# IN THE COURT OF APPEALS OF IOWA

No. 22-1876
Filed February 22, 2023

**IN THE INTEREST OF J.Q.,**
**Minor Child,**

**D.Q., Mother,**
    **Appellant.**

_____

Appeal from the Iowa District Court for Fayette County, Linnea Nicol, District

Associate Judge.

The mother appeals the termination of her parental rights. **AFFIRMED.**

Sandra Benzschawel of Meyer, Lorentzen & Nelson, Decorah, for appellant

mother.

Brenna Bird, Attorney General, and Mary A. Triick and Ellen Ramsey-

Kacena (until withdrawal), Assistant Attorneys General, for appellee State.

Kimberly S. Lange of the Public Defender's Office, Waterloo, attorney and

guardian ad litem for minor child.

Considered by Bower, C.J., and Badding and Buller, JJ.

**BULLER, Judge.**

The mother appeals the termination of her parental rights. Despite extensive efforts by the Iowa Department of Health and Human Services (HHS), the mother remains unable to provide a safe home for the child. We affirm the juvenile court's decision to terminate parental rights.

## I.     Background Facts & Proceedings

The child at issue was born to the mother in December 2021. The child was adjudicated as a child in need of assistance (CINA) and removed shortly after birth due to the mother's history of neglecting her other children and persistent inability to supervise the children or provide a safe home environment. (The mother's rights to three other children were recently terminated, and we affirmed termination as to two of those children. *See In re J.Q.*, No. 22-1481, 2023 WL 1811138, at *1–2 (Iowa Ct. App. Feb. 8, 2022). The juvenile court took judicial notice of those files, which are part of the record in this appeal.)

The mother has intellectual disabilities, and HHS documented the mother's substantial difficulties caring for her children on numerous occasions. Even after roughly two years of services, the mother requires prompting to change diapers and support an infant's head. HHS and other providers repeatedly raised safety concerns with the mother, but the same safety issues surfaced again and again during home visits.

The mother also has mental-health problems, but she has been unable to consistently attend treatment or other therapy despite recommendations for intensive outpatient services. She completed a "safe care curriculum" several times, but she was still unable to provide care for this child or the older children.

Part of the "safe care" curriculum involves placing laminated pictures "all over the house" and posting checklists of things that need done to provide for children. These interventions were unsuccessful because the mother "does not utilize" them. HHS also arranged for family preservation services to have a provider in the home on a daily basis for approximately eighty days, in ten-day increments. This intervention was also unsuccessful. At most, conditions in the home would improve for a few weeks at a time and then rapidly deteriorate.

HHS attempted to get the mother intellectual-disability waiver services, but the waiting list is long: two-and-one-half or three years out. HHS located comparable services through another provider, but the mother's attendance was poor and the services have not significantly improved her ability to care for children.

The home environment was consistently unsafe during the life of this case and the other CINA and termination proceedings. The children had access to pill bottles, choking hazards were on the floors and tables, high chairs were not properly used, candles were left lit and unattended, the mother fed unsafe food to the children, and the children were left in dirty diapers for extended periods of time, causing severe diaper rash. HHS observed cat feces on the floor, gnats, mice and mice droppings, improperly installed baby gates, and uncovered nails in the wall that the children could easily reach. During visits with the other children, the mother would walk out of the room or play on her phone instead of supervising. When taking the mother and children to therapy visits, the mother would fail to supervise the children and they would run into the road, requiring the HHS worker to intervene and stop them.

The mother had repeated issues associating with persons, in intimate relationships and otherwise, who are dangerous or bad for the children. As of the termination trial in this matter, it appears the mother was involved with a prison inmate with a history of drug charges, including methamphetamine use. She had also recently been involved with a man who was in prison for armed robbery. Another of the mother's close associates made threats toward and physically harmed her. Whenever these new men came by the house, the mother would tell the children that these men were "their new daddy," leading to confusion, uncertainty, and questions by the older children. On at least some occasions, the mother encouraged the children to talk to the incarcerated paramours on video chat, despite them not actually being the children's father. This concern about paramours and associates was consistently expressed by HHS and other service providers throughout the life of this case and related proceedings, with only occasional and temporary improvements in the mother's exercise of judgment.

The child has been outside the mother's care for his entire life, other than a few days after birth, and the mother never progressed beyond supervised visits. During supervised visits, the child displayed a flat affect toward the mother with limited engagement. The child has been placed with his father, where his needs are consistently met and he appears to be thriving. The child also has strong connections to the father's family. The mother is deeply resistant to any co-parenting role with the father; she has indicated she would prefer that they both lose the child, with the child placed in foster case, rather than let the father take custody. The mother has also threatened to kill the father, the father's new paramour, and their unborn child.

A contested termination hearing was held in August 2022. HHS, the child's father, and the child's guardian ad litem all recommended termination of the mother's rights. The juvenile court terminated the mother's rights, finding termination was in the best interests of the child and that the child could not be returned to the mother's care. This appeal follows.

## II. Standard of Review

We generally review an order to terminate parental rights de novo. *In re Z.K.*, 973 N.W.2d 27, 32 (Iowa 2022). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).

## III. Discussion

The mother makes a variety of challenges on appeal, asserting that she should have been granted additional time, that the State failed to prove the statutory elements for termination, that HHS did not provide reasonable efforts toward reunification, that termination is not in the best interests of the children, and that a permissive exception should apply. We reject these claims and affirm.

### A. Additional Time

The mother's first contention is that the juvenile court erred in not granting her additional time. There is no reason to think that, in an additional six months, the mother would become capable of caring for the child, when she failed to provide a safe or stable home at any point in the preceding two years. We agree with the State that "the mother's ability to keep herself safe is a work in progress" and she lacks the ability to care for the child now or any point in the foreseeable

future. And we note our holding here is consistent with our court's decision regarding the mother's other children. *See J.Q.*, 2023 WL 1811138, at *2.

### B. Statutory Elements

The mother next contends the State failed to meet its burden to prove the statutory requirements for termination. The mother's petition is not particularly clear on which elements she challenges. In any event, we find the evidence supports the juvenile court's decision to terminate the mother's rights under Iowa Code section 232.116(1)(h) (2022). The child was under the age of three, had been removed from the mother's care for at least six months with no trial home placement, and could not be returned to the mother's custody. As best we can tell, the mother's challenge is largely to the last prong, focusing on whether the child could be returned. But this case never progressed beyond supervised visits. *See In re C.N.*, No 19-1861, 2020 WL 567283, at *1 (Iowa Ct. App. Feb. 5, 2020) ("[The mother] never progressed to unsupervised visits or trial home visits. Without this necessary progression, we cannot say the children could have returned to the mother's care."). And the significant safety concerns persisted through the date of trial.

There is also a brief mention in the mother's petition that she believes a bridge order should have been entered. But one of the requirements for a bridge order is that the CINA case can close. *See* Iowa Code § 232.103A. This has never been possible during the life of this case: substantially the same persistent safety concerns about the home and mother's care that compelled the CINA adjudication animated termination at trial and our opinion in this appeal. Given the combination

of the continuing safety concerns and the lack of HHS support for this option, we affirm the rejection of a bridge order.

### C. Reasonable Efforts

The mother next challenges whether the State provided her with reasonable efforts toward reunification. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). In our de novo review of the record, we find the State provided reasonable efforts, securing numerous services for the mother over the course of years. Despite these extensive services over a significant period of the time, the mother is not capable of providing a safe home for the children, and she works to actively undermine any co-parenting efforts by the father. It is not clear what services the mother requested but did not receive, and we review her complaint in light of her repeated failures to complete or fully engage with the services she was offered. *See In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 2005) ("[A] parent has an equal obligation to demand other, different, or additional services prior to a permanency or termination hearing."). While there was a significant waiting period for certain specific intellectual-disability services, we find HHS provided comparable services through other means. We also note that our court rejected a similar challenge with regard to the mother's other children. *See J.Q.*, 2023 WL 1811138, at *1–2.

### D. Best Interests of the Child

In her next argument on appeal, the mother challenges whether termination is in the best interests of the child. *See* Iowa Code § 232.116(2) ("[T]he court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."). There is substantial evidence that

the mother is not able to provide a safe home, as detailed earlier in this opinion. We need not repeat those facts again, except to say that the home was unsuitable for children and the mother was not capable of providing a safe home on a consistent basis. The father and his paramour, in contrast, provide the child with a stable and safe home in which he is thriving. Termination is in the child's best interests, and we affirm.

### E. Permissive Exceptions

Last, the mother claims that a permissive exception, such as her bond with the child or the availability of a relative placement, should have precluded termination. *See* Iowa Code § 232.116(3)(a), (c). The mother bears the burden to prove a permissive exception. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018).

A parent's love is not enough to prevent termination, nor is the mere existence of a bond. *See In re A.B.*, 956 N.W.2d 162, 169–70 (Iowa 2021); *D.W.*, 791 N.W.2d at 709. There is scant proof of any bond with the child, as evidenced by the child's flat affect during interactions with the mother, particularly when compared to his thriving behavior while in the care of the father. We also find that, despite placement with a family member, any disadvantage the child may experience from termination is far outweighed by the danger posed by the mother. Our holding here is consistent with our court's previous adjudication related to the other children. *See J.Q.*, 2023 WL 1811138, at \*2. We, like the juvenile court, decline to apply any of the exceptions arguably invoked by the mother and affirm the termination of parental rights.

**AFFIRMED.**